NO. 06-51587

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

AVINASH RANGRA and ANNA MONCLOVA,
**Plaintiff-Appellants,**

VS.

FRANK BROWN and GREG ABBOTT,
**Defendant-Appellees.**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS, PECOS DIVISION

BRIEF OF APPELLANTS RANGRA AND MONCLOVA

DICK DeGUERIN
Texas Bar No. 05638000
DeGUERIN, DICKSON & HENNESSEY
1018 Preston Avenue, Seventh Floor
Houston, Texas 77002
Telephone: 713-223-5959
Facsimile: 713-223-9231

ARVEL RODOLPHUS PONTON III
Texas Bar No. 16115170
2301 North Highway 118
P.O. Box 9760
Alpine, Texas 79831
Telephone: 432-837-0990
Facsimile: 432-837-0971

ATTORNEYS FOR APPELLANTS, RANGRA
AND MONCLOVA

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

1.    Avinash Rangra
      Plaintiff/Appellant

2.    Anna Monclova
      Plaintiff/Appellant

3.    Dick DeGuerin
      Texas Bar No. 05638000
      DeGUERIN, DICKSON & HENNESSEY
      1018 Preston Avenue, Seventh Floor
      Houston, Texas 77002
      Attorney for Plaintiff/Appellants Avinash Rangra and Anna Monclova

4.    Arvel Rodolphus Ponton III
      Texas Bar No. 16115170
      2301 North Highway 118
      P.O. Box 9760
      Alpine, Texas 79831
      Attorney for Plaintiff/Appellants Anna Monclova and Avinash Rangra

5.    Dennis Olson
      Visiting Professor of Law
      Texas Tech University School of Law
      1802 Hartford Avenue
      Lubbock, Texas 79409-0004
            *After July 15, 2007:*
                  University of Detroit Mercy School of Law
                  651 East Jefferson Avenue
                  Detroit, Michigan 48226
      Consultant for Messrs. DeGuerin and Ponton

6.    Frank D. Brown
      District Attorney for the 83d Texas Judicial District
      Defendant

7.    Greg Abbott
      Attorney General of Texas
      Defendant

8.    J. Steven Houston
      P.O. Box 396
      Marathon, Texas 79842
      Attorney for Defendant/Appellee Frank D. Brown

9.    James Todd
      Jeff Rose
      Office of the Attorney General
      State of Texas
      P.O. Box 12548
      Capitol Station
      Austin, Texas 78711
      Attorneys for Defendant/Appellee Greg Abbott


                                             _____

DICK DeGUERIN
Texas Bar No. 05638000
DeGUERIN, DICKSON & HENNESSEY
1018 Preston Avenue, Seventh Floor
Houston, Texas 77002
Telephone: 713-223-5959
Facsimile: 713-223-9231

ARVEL RODOLPHUS PONTON III
Texas Bar No. 16115170
2301 North Highway 118
P.O. Box 9760
Alpine, Texas 79831
Telephone: 432-837-0990
Facsimile: 432-837-0971
ATTORNEYS FOR PLAINTIFF /
APPELLANTS, AVINASH RANGRA AND
ANNA MONCLOVA

## **STATEMENT REGARDING ORAL ARGUMENT**

Oral argument would be helpful to the Court in deciding this case because the case presents an issue of first impression within this Circuit, namely whether the First Amendment protects public officials from prosecution for receiving or disseminating the written word without criminal intent.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ............................................ i

STATEMENT REGARDING ORAL ARGUMENT .................................... iii

TABLE OF CONTENTS............................................................................. iv

TABLE OF AUTHORITIES ........................................................... vii

CONSTITUTIONAL PROVISIONS AND STATUTES PRESENTED ......... xv

JURISDICTIONAL STATEMENT ................................................. 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ................... 2

STATEMENT OF THE CASE ....................................................... 2

STATEMENT OF THE FACTS...................................................... 3

SUMMARY OF THE ARGUMENT ............................................... 6

STANDARD OF REVIEW ........................................................... 9

ARGUMENT AND AUTHORITIES ........................................... 10

I.    Passive receipt of electronic mail, standing alone, cannot be a crime absent criminal intent ...................................................................... 10

    A.    The State asserted and the trial court accepted that Monclova and Rangra violated § 551.144 ......................................... 10

    B.    The criminal liability asserted by the state and accepted by the trial court is strict liability ............................................... 11

    C.    The District Court erred by reinterpreting § 551.144 contrary to the interpretation adopted by the Texas Court of Criminal Appeals    14

    D.    Imposing strict liability for speech activities, such as receiving an e-mail, offends core First Amendment values ............................. 16

II.     Importance and History of First Amendment Rights.................    17

III.    TOMA § 551.144 criminalizes conduct that merely has the appearance of the
        appearance of corruption and is therefore overbroad ...........................    21

        A.      TOMA broadly proscribes exchanges of information because
                exchanges of information can appear to be like meetings ..........    21

        B.      Section 551.144 criminalizes a broad set of protected speech activity,
                is substantially overbroad, and violates the First Amendment ...    23

                1.  Section 551.144 is substantially overbroad ........................    23

                2.  The District Court imposed its own interpretation of state law on
                    state authorities and failed to apply the First Amendment
                    overbreadth doctrine properly .............................................    26

                3.  The overbreadth doctrine protects Monclova and Rangra from an
                    unrestrained power to threaten prosecution for violating § 551.144
                    ........................................................................................    28

IV.     Section 551.144 is unconstitutionally vague  ........................................    30

        A.      The trial court applied the wrong vagueness standard ...............    30

        B.      Under the correct vagueness standard, Section 551.144 fails because it
                does not provide notice of what it prohibits and it encourages arbitrary
                enforcement .............................................................................    32

V.      Public Employment speech cases do not justify the State's threatened criminal
        prosecution of Monclova and Rangra....................................................    34

        A.      No prior case from any court in the nation has allowed the
                government to impose criminal sanctions for public employee speech
                ........................................................................................    35

        B.      Citizens serving in uncompensated elected positions are not public
                employees and should retain the free speech rights typical of citizens
                ........................................................................................    38

1. Supreme Court precedent establishes the distinction between public employees and elected office holders .................................. 38

2. The trial court failed to acknowledge the elected office holder status of Monclova and Rangra because it misread this Court's decision in *Rash-Aldridge* .................................................. 39

3. The trial court also misread Kansas law ............................. 42

4. Cogent policy reasons support broadly protecting elected officeholders' First Amendment rights................................. 43

C. The Alpine Water Project was a matter of public concern; therefore, reading or expressing opinions related to it is protected speech activity even for public employees ........................................................ 44

VI. The valid interests behind TOMA are not inextricably tied to the current law or its interpretation .................................................................. 46

A. TOMA is unique among open meetings laws in its breadth. ...... 47

B. Recent case law also shows that less speech suppressive means are available to vindicate the State's interests .................................. 49

CONCLUSION ............................................................ 50

CERTIFICATE OF SERVICE...................................................... 52

CERTIFICATE OF COMPLIANCE............................................... 53

APPENDIX A   ............................................................................ A-1

# TABLE OF AUTHORITIES

<u>Constitution</u>

U.S. Const. Amend. I ..................................................... *passim*

U.S. Const., Amend. XIV .......................................................xv, 1

<u>Cases</u>

*Alabama v. Shelton,*
    535 U.S. 654 (2002) .........................................................12

*Aptheker v. Secretary of State,*
    378 U.S. 500 (1964) .........................................................16

*Argersinger v. Hamlin,*
    407 U.S. 25 (1972) .........................................................12

*Arizonans for Official English v. Arizona,*
    520 U.S. 43 (1997) .........................................................27

*Ashcroft v. ACLU,*
    124 S. Ct. 2783 (2004) (Stevens, J., concurring) ..............................37

*Banks v. Armontrout,*
    872 F.2d 237 (8th Cir 1989) .............................................27

*Beck v. Shelton,*
    593 S.E.2d 195 (Va. 2004) ...............................................49

*Board of Airport Commissioners v. Jews for Jesus,*
    482 U.S. 569 (1987) .........................................................29

*Bond v. Floyd,*
    385 U.S. 116 (1966) ................................................. 19, 39

*Buckley v. Valeo,*
    424 U.S. 1 (1976) .........................................................22

*Center for Individual Freedom v. Carmouche,*
    449 F.3d 655 (5th Cir. 2006) ...................................................... 22, 24

*City of Chicago v. Morales,*
    527 U.S. 41 (1999) ..................................................................... 26, 31

*City of Erie v. Pap's A.M.,*
    529 U.S. 277 (2000) ........................................................................ 7

*City of Houston v. Hill,*
    482 U.S. 451 (1987) .................................................................. 23, 25

*Connick v. Myers,*
    461 U.S. 138 (1983) ......................................................................... 35

*Dombrowski v. Pfister,*
    370 U.S. 479 (1965) ......................................................................... 28

*Elfbrandt v. Russell,*
    384 U.S. 11 (1966) ........................................................................... 16

*FEC v. Nat'l Right to Work Comm.,*
    459 U.S. 197 (1982) ......................................................................... 22

*Florida Star v. B.J.F.,*
    491 U.S. 524 (1989) ......................................................................... 16

*Ford Motor Co. v. Texas Department of Transportation,*
    264 F.3d 493 (5th Cir. 2001) .......................................................... 30

*Forsyth County v. Nationalist Movement,*
    505 U.S. 123 (1992) ......................................................................... 27

*Garcetti v. Ceballos,*
    126 S. Ct. 1951 (2006) .............................................................. 36, 38

*Gewertz v Jackson,*
    467 F. Supp. 1047 (D.C.N.Y. 1979)……………………………….20

*Huggins v. Isenbarger,*
    798 F.2d 203 (7th Cir. 1986) (Easterbrook, J., concurring) ..............27

*Hynes v. Mayor of Oradell,*
    425 U.S. 610 (1976) ........................................................................32

*Johnson v. Fankell,*
    520 U.S. 911 (1997) .......................................................................27

*Kolender v. Lawson,*
    461 U.S. 352 (1983)....................................................... 23, 27, 32, 37

*Law Students Civil Rights Research Council, Inc. v Wadmond,*
    401 U.S. 154 (1971)(Black, J. Dissenting)………………………… ......18

*Lewis v. City of New Orleans,*
    415 U.S. 130 (1974) (Powell, J., concurring) ...................................30

*Martin v. Struthers,*
    319 U.S. 141 (1943) .......................................................................16

*McConnell v. FEC,*
    540 U.S. 93 ...................................................................................22

*Medlin v. Palmer,*
    874 F.2d 1085 (5th Cir. 1989) ........................................................31

*Miller v. Hull,*
    878 F.2d 523 (1st Cir.), cert. denied, 493 U.S. 976 (1989) ..........20, 40

*New York Times Co. v Sullivan,*
    376 U.S. 254 (1964)………………………………………… ......18, 19

*Pickering v. Board of Education,*
    391 U.S. 563 (1968) ............................................................ 36, 44, 45

*Pico v. Board of Educ.,*
    457 U.S. 853 (1982) (plurality) ......................................................16

*Rankin v. McPherson,*
    483 U.S. 378 (1987) ........................................................35

*Rash-Aldridge v. Ramirez,*
    56 F.3d 117 (5th Cir. 1996) (per curiam) .........................39

*Reno v. ACLU,*
    521 U.S. 844 (1997) .................................................. 16, 23

*Roth v United States,*
    354 U.S. 476 ……………………………………………18

*Smith v. California,*
    361 U.S. 147 (1959) ........................................................32

*Stanley v. Georgia,*
    394 U.S. 557 (1969) ........................................................16

*State ex rel. Murray v. Palmgren,*
    231 Kan. 524, 646 P.2d 1091 (1982) ...............................42

*Thompson v. State,*
    44 S.W.3d 171 (Tex. 14th App. 2001) .............................14

*Tovar v. State,*
    978 S.W.2d 584 (Tex. Crim. App. 1998) (en banc) ...................*passim*

*United Public Workers v. Mitchell,*
    330 U.S. 75 (1947) ..........................................................38

*United States v. Escalante,*
    239 F.3d 678 (5th Cir. 2001) ...........................................31

*United States v. Salerno,*
    481 U.S. 739 (1987) ........................................................24

*United States v. Wallington,*
    889 F.2d 573 (5th Cir. 1989) ...........................................26

*United States v. X-Citement Video,*
    513 U.S. 64 (1994) ...........................................................................26

*Vacca v Barletta,*
    753 F. Supp. 400 (D. Mass. 1990)…………………………………20

*Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ..............................................................23, 31

*Virginia v. American Booksellers Ass'n,*
    484 U.S. 383 (1988) ........................................................................27

*Virginia v. Black,*
    538 U.S. 343 (2003) (plurality opinion) ...........................................16

*Whitney v California,*
    274 U.S. 357 …………………………………………………………18

*Winters v. New York,*
    333 U.S. 507 (1948) ...........................................................23, 30, 37

*Wood v. Georgia,*
    370 U.S. 375 (1962) .......................................................................38

## Statutes

18 U.S.C. § 1905..................................................................................26

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331.....................................................................................1

28 U.S.C. § 2201 ....................................................................................1

28 U.S.C. § 2202 ....................................................................................1

42 U.S.C. § 1983 ...................................................................................1

Fed. R. App. P. 32(a) ...........................................................................53

Fed. R. Civ. P. 57 ....................................................................1

Alaska Stat. §§ 44.62.310 – 44.62.312 ...................................47

Ariz. Rev. Stat. Ann § 38-431 ................................................47

Ark. Code Ann §§ 54950 - 54960.5 ........................................47

Cal. Gov't Code §§ 54950 – 54950.5 ......................................48

Cal. Gov't. Code § 54952.6 ....................................................48

Colo. Rev. Stat. Ann. § 24-72-201 ..........................................48

Conn. Gen. Stat. Ann § 1-206 .................................................47

Fla. St. Const. Art. I, § 24(b) ..................................................47

Ga. Code Ann. § 50-14-6 ........................................................48

Idaho Code Ann. §§ 67-2341 - 67-2347 ..................................47

Ind. Code Ann. §§ 5-14-1.5-1 – 5-14-1.5-8 ............................47

Ky. Rev. Stat Ann. §§ 61.810 - 61.850 ...................................47

Mass. Gen. Laws Ann. Ch. 30A, §§ 11A – 11A½ ....................47

Md. Code Ann., State Gov't §§ 10-501 – 10-502 .....................47

Me. Rev. Stat. Ann. Tit. 1, § 1005 ...........................................47

Minn. Stat. Ann. §§ 13D.01 – 13D.07 .....................................47

Miss. Code Ann. §§ 25-41-1 – 25-41-17 .................................48

Mo. Ann. Stat. §§ 610.010 – 610.200 ......................................48

N.D. Cent. Code §§ 44-04-01 – 44-04-23 ................................48

N.Y. Pub. Off. Law §§ 100 – 111 ............................................................48

Neb. Rev. Stat. §§ 610.010 – 610.200 ....................................................48

Nev. Rev. Stat. §§ 241.010 – 241.040 ....................................................48

Ohio Rev. Code Ann. § 121.22 ...............................................................48

Okla. Stat. Ann. tit. 25, §§ 304, 314 .......................................................48

Or. Rev. Stat. §§ 192.610 – 192.695 .......................................................48

65 Pa. Cons. Stat. Ann. §§ 701-716 ........................................................48

R.I. Gen. Laws § 42-46-1 ........................................................................48

S.C. Code Ann. §§ 30-04-60 – 30-4-110 .................................................48

S.D. Codified Laws § 1-25-1 ...................................................................48

Texas Government Code § 551.005 ..........................................................33

Texas Government Code § 551.042 ..........................................................34

Texas Government Code § 551.143 ...................................................*passim*

Texas Government Code § 551.144 ...................................................*passim*

Utah Code Ann. § 52-4-1 .........................................................................48

Va. Code Ann. § 2.2-3700 .......................................................................49

Vt. Stat. Ann. tit. 1, § 310 .......................................................................48

W. Va. Code Ann. 6-9-A1 .......................................................................48

Wash. Rev. Code Ann. § 42.30 ...............................................................48

Wis. Stat. Ann. § 19.81 ...........................................................................48

Wyo. Stat. Ann. §§ 16-4-401 – 16-4-408 .................................................48

Opinions of the Texas Attorney General

Tex. Atty. Gen. Op. DM-95 (1995) ..........................................................12

Tex. Atty. Gen. Op. GA-0326 (2005) .......................................................15

Tex. Atty. Gen. Op. GA-0511 (2007) .......................................................15

Tex. Atty. Gen. Op. JC-0169 (2000) ....................................................33-34

Tex. Atty. Gen. Op. JC-0307 (2000) ........................................................12

Tex. Atty. Gen. Op. JC-0313 (2000) ........................................................12

Tex. Atty. Gen. Op. JC-0451 (2002) ........................................................14

Secondary Authorities

Black's Law Dictionary 1275 (5th ed. 1979) ............................................11

Federalist Papers No. 52…………………………………………………17

## CONSTITUTIONAL PROVISIONS AND STATUTES PRESENTED

U.S. Const., Amend I:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const., Amend XIV, §1:

> All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Texas Government Code § 551.144:

> Sec. 551.144. CLOSED MEETING; OFFENSE; PENALTY. (a) A member of a governmental body commits an offense if a closed meeting is not permitted under this chapter and the member knowingly:
>
> (1)  calls or aids in calling or organizing the closed meeting, whether it is a special or called closed meeting;
>
> (2)  closes or aids in closing the meeting to the public, if it is a regular meeting;  or
>
> (3)  participates in the closed meeting, whether it is a regular, special, or called meeting.
>
> (b)  An offense under Subsection (a) is a misdemeanor punishable by:
>
> (1)  a fine of not less than $100 or more than $500;
>
> (2)  confinement in the county jail for not less than one month or more than six months;  or
>
> (3)  both the fine and confinement.
>
> (c)  It is an affirmative defense to prosecution under Subsection (a) that the member of the governmental body acted in reasonable reliance on a court order or a written interpretation of this chapter

contained in an opinion of a court of record, the attorney general, or the attorney for the governmental body.

TO THE HONORABLE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT:

Avinash Rangra and Anna Monclova, Appellants, file this brief and request that this Court reverse the judgment rendered by the Honorable Robert Junell, Judge of the United States District Court for the Western District of Texas, Pecos Division ("the District Court") and remand the case with instructions to enter a declaratory judgment striking down Texas Government Code §551.144.

## JURISDICTIONAL STATEMENT

This case was filed in the District Court as a declaratory judgment action under 28 U.S.C. §§ 2201, 2202 and Fed. R. Civ. P. 57. The plaintiff's claims derive from U.S. Const. Amends. I and XIV and 42 U.S.C. § 1983 and thus "aris[e] under the Constitution [and] laws … of the United States." The federal questions presented by the plaintiff placed the case within the subject matter jurisdiction of the District Court. 28 U.S.C. § 1331.

After a bench trial held on July 26, 2006, the Honorable Robert Junell, United States District Judge, issued Findings of Fact and Conclusions of Law and a Final Judgment denying all relief sought by the Plaintiffs on November 7, 2006. R. 453-467. Plaintiffs filed a Notice of Appeal on November 30, 2006. R. 468-469. This Court's jurisdiction over the appeal arises from 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

The issue presented on appeal is whether the First Amendment protects elected public officials from strict criminal liability for receiving or disseminating facts or opinions on matters of public concern.

## STATEMENT OF THE CASE

Having been threatened with prosecution under Texas Government Code § 551.144, which imposes strict criminal liability under the Texas Open Meetings Act (TOMA), Plaintiffs Monclova and Rangra filed this

declaratory judgment action in the District Court against the local District Attorney, Frank Brown, and the State Attorney General, Jim Abbott. Monclova and Rangra sought a declaration that § 551.144 – having been interpreted by the State to criminalize the asynchronous receipt or exchange of written material, including e-mails – violates the First Amendment.

Brown and Abbott moved to dismiss the complaint. R. 125-147, 152-158. The District Court withheld a decision on that motion and scheduled a bench trial. R. 310-311; Hearing Transcript 52-53. After the trial, the District Court denied the motion to dismiss, R. 393-394, and later issued findings of fact and conclusions of law encompassing a final judgment in which the District Court denied the relief plaintiffs sought. R. 453-467.

2

## STATEMENT OF THE FACTS

Sometime, on October 21 or 22, 2004, Anna Monclova violated the criminal law of Texas twice. R. 462 (Conclusions of Law ¶¶17-18); see also R. 131 (State Defendants' Motion to Dismiss) ("[T]he plaintiffs' conduct … violated the Open Meetings Act."). She received two e-mails. R. 455-456 (Findings of Fact ¶¶6-7).

In the same time period, Avinash Rangra also twice violated the criminal law of Texas. R. 131, 462. He received an e-mail, and he replied to it. R. 455-456 (Findings of Fact ¶¶6-7).

At the time of these nefarious deeds, Monclova and Rangra were two of the five members of the Alpine City Council. R. 455 (Findings of Fact ¶4). Their first crime occurred when another member of the city council, Katie Elms-Lawrence, sent the following e-mail to Monclova, Rangra, and one additional member of the council, Manuel Payne:

> Avinash, Manuel .. Anna just called and we are both in agreement we need a special meeting at 6:00pm Monday … so you or I need to call the mayor to schedule it( mainly you, she doesn't like me right now I'm Keri's MOM) .. we both feel Mr. Tom Brown was the most impressive .. no need for interviewing another engineer at this time…have him prepare the postponment of the 4.8 million, get us his firms review and implementations for the CURE for South Alpine….borrow the money locally and get it fixed NOW….then they show good faith and do the job allow them to sell us their bill of goods for water connections for the entire city……at a later date..and use the 0 % amounts to repay the locally borrowed money and fix the parts that don't meet TECQ standards…. We don't have to marry them…with a life long contract, lets just get engaged!
> Let us hear from you both

KT

R. 66 (punctuation and spelling in original).

The second crime occurred when Rangra replied to the e-mail:

> Hello Katie…..
> I just talked with John Voller of Hibb and Todds of Abilene… and invited him to come to the Monday meeting… I asked him to bring his money man also…. These guys work for Sul Ross… He said… he will be at the meeting Monday…
> I'll talk with Tom Brown after my 8:00 class…
> Thanks for your advice….. and I'll talk with Mickey as per your, Anna, and Manuel directions… and arrange the meeting on Monday. We must reach some sort of decision  SOOOOOOOOOOOOOON.
> Avinash
> Katie… please correct my first name spellings… Thanks.

R.66 (punctuation and spelling in original).

In accord with the suggestions in both e-mails, the council "held a meeting pursuant to proper notice, and the issues relating to the proposed water project and the engineers to hire for it were discussed openly and fully." R. 456 (Findings of Fact ¶8).

Brown became aware of the e-mails, R. 4, and subpoenaed the four council members to testify before the Brewster County Grand Jury. Each council member refused to testify. R. 456 (Findings of Fact ¶10).

Brown then granted testimonial immunity to force the testimony of Monclova and Payne, R. 457 (Findings of Fact ¶11), and sought and obtained indictments of Rangra and Elms-Lawrence. R. 68, 70, 457 (Findings of Fact ¶12).

Rangra and Elms-Lawrence were the two council members up for re-election three months later in May 2005. R. 455 (Findings of Fact ¶5); Trial Transcript 93.

When faced with a First Amendment challenge to the indictments, R. 457 (Findings of Fact ¶14), Brown dismissed the indictment of Elms-Lawrence, R. 72, and attempted to dismiss the indictment of Rangra. R. 74. In both instances, Brown reserved the right to re-file the criminal charges. R. 457 (Findings of Fact ¶¶15-16). Rangra and Elms-Lawrence objected to the dismissal, insisting that they be given an opportunity to clarify their speech rights, R. 76-85, 88-93, but the state court refused to set aside the Elms-Lawrence dismissal and granted Brown's request to dismiss Rangra's indictment. R. 74, 86. When Rangra and Elms-Lawrence sought to expunge the record of their indictments, Brown opposed the request, and when he lost, he appealed that decision. Trial Transcript at 67-68.

Monclova and Rangra remained under a threat of prosecution. Rangra had received no decision from the state court on the merit of the indictment, and the dismissal was without prejudice. Monclova's immunity was limited to her testimony before the grand jury. Therefore, they filed this declaratory judgment action in federal district court seeking an order striking Texas Government Code § 551.144. R. 2-10, 335.

In response to the present suit, Attorney General Abbott and District Attorney Brown (hereinafter referred to collectively as "the State") asserted flatly

5

that "the plaintiffs' conduct, as they describe it in their pleadings, violated the Open Meetings Act." R. 131, 155.

## SUMMARY OF THE ARGUMENT

It is critical to understand what Monclova and Rangra do not challenge in this case. They do not challenge the Texas Open Meetings Act (TOMA) in its totality. In fact, they endorse the laudable goals of TOMA to ensure that the public business is conducted in public. Furthermore, Monclova and Rangra do not challenge §551.143, the provision of TOMA imposing criminal sanctions for conspiracies to evade the strictures of TOMA. In fact, Appellants endorse that section as a proper and appropriate method of protecting the public interest.

What Monclova and Rangra do challenge is the State's decision to ignore TOMA's conspiracy provision in favor of imposing strict criminal liability in situations that can only be called meetings in the loosest imaginable sense. Regardless whether the State has made this choice cognizant of its chilling effect on free speech or has blithely trampled on speech rights with an innocent desire to ease the role of prosecutors, the State has crossed the First Amendment line. Rather than face the burden of establishing scienter, the State has chosen to impose strict liability on any public official who receives information along with a quorum and any citizen who sends information to that quorum. This broad criminalization of

speech proscribes everyday innocent acts such as attending civic functions and receiving e-mails.

If, in the early stages of this case, the State had disavowed the indictments in this case and admitted that state law does not permit the threatened prosecutions, the litigation would, of necessity, have terminated. That never happened. In fact, the exact opposite occurred. The State flatly proclaimed, "the plaintiffs' conduct … violated the Open Meetings Act." R. 131. Of course, for the State to retract this now would be an attempt to manipulate the mootness doctrine to preserve a favorable decision. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 288 (2000).

The District Court erred in this case in two significant respects. First, the court attempted to rewrite Texas law to require scienter under § 551.144. Second, the court misunderstood and misapplied First Amendment law.

In suggesting that § 551.144 might require scienter, the District Court followed the State into a web of contradictory assertions. While the State asserts clearly that "the plaintiffs' conduct … violated the Open Meetings Act," the State nonetheless convinced the court that the statute is not a strict liability criminal provision. This position is impossible because, in the complaint to which the State refers, Rangra and Monclova averred nothing regarding criminal intent. R. 4. They had no way of knowing that they were part of a closed meeting when they received their e-mail. R. 4. Furthermore, the State's position contradicts state law, which

7

clearly views §551.144 as a strict liability provision. *Tovar v. State*, 978 S.W.2d 584, 587 (Tex. Crim. App. 1998) (en banc).

The trial court misunderstood and misapplied law of the First Amendment in two specific ways.

First, the District Court credited the State's interest in open meetings as so compelling that it will override any countervailing concern about the breadth of its coverage. Thus, the State's interest in openness is so strong that the State may prohibit any speech that looks like it could be part of a conspiracy to evade the open meetings laws. The effect of the trial court's position is that the State may criminalize the appearance of the appearance of corruption, without regard to whatever speech interests it might impair in the process and without regard to overbreadth and vagueness.

Second, the District Court failed to grasp the differences between job action and a criminal prosecution and between elected office holders and public employees. Ostensibly following the public employee speech cases, the court held that elected office holders and public employees have no First Amendment rights and may be prosecuted and imprisoned for their statements on matters of public concern.

## **STANDARD OF REVIEW**

Appellants' challenges to the District Court's judgment are based on errors of law, and the governing standard for this Court is de novo review. Furthermore, because the State bears the burden of justifying restrictions on speech, the District Court's judgment must be reversed if the District Court erred on any of the premises underlying its judgment. If the State has imposed strict criminal liability for receiving speech, if the State law is substantially overbroad, if the State law is vague, *or* if the State may not impose criminal sanctions under the public employee speech doctrine, then the District Court's judgment is fatally flawed.

# ARGUMENT AND AUTHORITIES

## I.  Passive receipt of electronic mail, standing alone, cannot be a crime absent criminal intent.

The indictments and threatened prosecutions in this case stem from the passive receipt of e-mails with no criminal intent. This is a strict liability crime, and imposing strict criminal liability for engaging in speech offends core First Amendment values.

### A.  The State asserted and the trial court accepted that Monclova and Rangra violated § 551.144

The State asserted that the conduct of Monclova and Rangra "as they describe it in their pleadings, violated the Open Meetings Act." R. 131. The alleged violation is "based solely on [an] exchange of e-mails." R. 457 (Findings of Fact ¶13).

Monclova and Rangra describe the exchange of e-mails in their pleadings as follows:

> 9.     On October 21, 2004, Monclova, Payne (another city council member), and Rangra received an e-mail from Katie Elms-Lawrence, who at that time was also a member of the Alpine City Council.
> 10.    On October 22, 2004, Rangra responded to the prior day's e-mail from Elms-Lawrence, copying his response to Monclova and Payne.

R. 4. Other than providing the text of the e-mails, there is no further discussion of the e-mails in the pleadings.

The State therefore asserts that Monclova committed a crime by doing nothing more than receiving two e-mails. She admits no criminal intent of any sort, and the State does not claim it would have to prove any intent. R. 131.

Furthermore, the State asserts that Rangra committed a crime with no criminal intent when he read and replied to the e-mail he received. R. 131.

While the District Court avoided an express statement that Monclova and Rangra violated the law, the court's acceptance of the State's assertion is clear. "The Plaintiffs have a fear of prosecution that is neither 'imaginary nor wholly speculative.'" R. 458 (Conclusions of Law ¶7). "[T]he speech at issue … is not protected by the First Amendment from the restriction imposed by [TOMA]." R. 461, 462 (Conclusions of Law ¶¶14, 17). "Here, the TOMA is not regulating speech." R. 462 (Conclusions of Law ¶18).

**B.    The criminal liability asserted by the State and accepted by the trial court is strict liability.**

While the State and the District Court may want to quibble with definitions, convicting a person of a criminal act with no scienter means the crime is a strict liability crime. *See* Black's Law Dictionary 1275 (5th ed. 1979) ("Strict liability statute. One which imposes criminal sanction for an unlawful act without requiring a showing of criminal intent.")

Under Texas law, when a quorum of a public body participates in a closed meeting it is a strict liability crime. Although the text of Texas Government Code §

551.144 uses the word knowingly, the Texas Court of Criminal Appeals has specified that "the adverb knowingly immediately precedes and modifies the verbs calls, aids, closes, and participates." *Tovar v. State*, 978 S.W.2d 584, 587 (Tex. Crim. App. 1998) (en banc). "The statute does not specify any other culpable mental state; thus it does not provide a culpable mental state with regard to the element that a closed meeting is not permitted under the Act." 978 S.W.2d at 587.

The Court of Criminal Appeals continued to clarify its position on scienter:

> Public welfare offenses, like § 551.144, involve neglect where the law requires care, or inaction where it imposes a duty. Similarly, public welfare offenses typically involve relatively minor punishment, as does section 551.144[1], and tend to hold persons strictly liable for their conduct. Thus, our holding is consistent with our prior holdings, as it is not uncommon for this type of offense to impose strict liability.

978 S.W.2d at 587 (citations omitted).

The four members of the council who saw these e-mails constituted a quorum of the council. R. 455 (Findings of Fact ¶2). The asynchronous written exchange of information – with or without response – is participation in a meeting. Tex. Atty. Gen. Op. DM-95 at 5 (1995) (asynchronous); Tex. Atty. Gen. Op. JC-0307 at 5-6 (2000) (written); Tex. Atty. Gen. Op. JC-0313 at 3 (2000) (without

---

[1] Appellants disagree with most of the Texas state authorities' interpretations of TOMA, but that disagreement is not before this Court, which must accept Texas law as it stands and measure it against the United States Constitution. However, Appellants feel compelled to note especially their disagreement with the proposition that six months' imprisonment is a minor punishment. *Cf. Alabama v. Shelton*, 535 U.S. 654 (2002); *Argersinger v. Hamlin*, 407 U.S. 25, 37 (1972) ("[A]bsent a knowing and intelligent waiver, no person may be imprisoned for any offense, whether classified as petty, misdemeanor, or felony, unless he was represented by counsel at his trial.").

response) ("[M]embers of the Board do not have to participate in the deliberation for the statute to apply. Their mere presence, which results in a quorum, is sufficient to bring the meeting within the Open Meetings Act as long as any voting member … participates in a verbal exchange about public business or policy over which the Board has supervision or control.").

Given the combination of strict liability and the breadth of TOMA's interpretation of a meeting, Monclova and Rangra clearly violated § 551.144. They were cognizant that they received the e-mails. No further knowledge – such as that the e-mails constituted a meeting – is required under Texas law. *Tovar*, 978 S.W.2d at 586. The State admits that Monclova and Rangra violated the law in its own filings with the District Court, R. 131, and the District Court indicated its acceptance of this fact by holding that the speech at issue "is not protected by the First Amendment from the restriction imposed by the Texas Open Meetings Act." R. 461, 462 (Conclusions of Law ¶14, 17).

A separate statutory provision, Texas Government Code § 551.143, addresses conspiracies to evade open meetings laws and clearly requires proof of criminal intent. But the State has not relied on § 551.143; it has doggedly maintained that Monclova and Rangra violated the strict liability provision in § 551.144. R. 68, 70, 131.

**C.     The District Court erred by reinterpreting § 551.144 contrary to the interpretation adopted by the Texas Court of Criminal Appeals.**

The District Court conflated § 551.144 with § 551.143 and ignored the strict liability nature of § 551.144. The District Court quoted the word "knowingly" from the statute, as if the statute would not impose strict liability. R. 460 (Conclusions of Law ¶13); see also Trial Transcript at 201-202 (Counsel for Abbott argued that the term strict liability is "a misnomer."). Furthermore, Brown's counsel intimated that the legislature's revisions of TOMA in 1999 overrode the Texas Court of Criminal Appeals decision in *Tovar v. State*, 978 S.W.2d 584 (Tex. Crim. App. 1998). Trial Transcript at 202-203.

If § 551.144 is not a strict liability provision, that would be news to the Texas legislature, the Texas courts, and apparently to Attorney General Abbott.

The 1999 amendments added subsection (c) to 551.144. That subsection provides a defense to members of a governmental body who reasonably rely on a written interpretation of TOMA before speaking or listening. Nothing in § 551.144(c) is inconsistent with strict liability; it simply provides limited relief – when speech receives prior approval – from the strict liability.

Tovar continues to be cited by the Texas courts and the Attorney General as an example of strict criminal liability. *See Thompson v. State*, 44 S.W.3d 171 (Tex. 14th App. 2001); Tex. Atty. Gen. Op. JC-0451 at 6 (2002) (citing *Tovar* with the

14

parenthetical explanation "holding that Open Meetings Act offense imposes strict liability").

Attorney General Abbott has cited *Tovar* specifically as providing the governing construction of the word "knowingly" for § 551.144, Tex. Atty. Gen. Op. GA-0326 (2005), and establishing that improperly closed meetings may be subject to the criminal sanctions of § 551.144. Tex. Atty. Gen. Op. GA-0511 (2007). It is interesting to note in GA-0511, which was issued after the appeal in this case had been filed, that the Attorney General was more cautious about asserting criminal liability than he was in this case. Rather than assert liability directly, he defers to a jury determination while still citing *Tovar*, which imposes a strict liability standard that could only fail to yield a conviction if the jury disregards the law. *See id.* at 16-18; *Tovar*, 978 S.W.2d at 586 ("In order to convict appellant, the jury charge in this case only required the jury to find that appellant acted knowingly with regard to calling, aiding in calling or organizing, or participating in the special closed meeting. The jury charge did not require the jury to find that appellant possessed any mental state with regard to the special closed meeting not being permitted under the act.").

Ultimately, the narrow issue of strict liability may be irrelevant. Even if there is some mental element that the State must prove, the State obviously believed that the mental state existed here. R. 131. Monclova did nothing more

than receive two e-mails, and Rangra did nothing more than receive one e-mail and respond to it with a suggestion of open-mindedness at the coming open meeting. R. 455-456 (Findings of Fact ¶¶6-7). The indictments and threatened prosecutions were based solely on the exchange of e-mails. R. 457 (Finding of Fact ¶13). But neither e-mail, whether sent or received, can support criminal liability in light of the First Amendment.

> **D.    Imposing strict liability for speech activities, such as receiving an e-mail, offends core First Amendment values.**

The First Amendment freedom of speech includes, as a necessary corollary, the right to receive speech. *Martin v. Struthers*, 319 U.S. 141, 143 (1943); *see also Reno v. ACLU*, 521 U.S. 844, 877 (1997); *Pico v. Board of Educ.*, 457 U.S. 853 (1982) (plurality); *Stanley v. Georgia*, 394 U.S. 557 (1969). There is no strict liability crime for speaking. Likewise, to protect the right to receive information, courts must view a strict liability crime of receiving information with exceptional scrutiny. Scienter is often viewed as a requisite element of any crime involving First Amendment activity. *See Virginia v. Black*, 538 U.S. 343 (2003) (plurality opinion); *Elfbrandt v. Russell*, 384 U.S. 11 (1966); *Aptheker v. Secretary of State*, 378 U.S. 500 (1964). *See also Florida Star v. B.J.F.*, 491 U.S. 524, 539 (1989) (requiring scienter for civil liability).

## II.    Importance and history of First Amendment rights

Our Founding Fathers envisioned a representative form of government that would take the place of citizens meeting in person.  The Federalist, No, 52, p. 338 (Scigliano ed. 2000).  The electors were to be the "great body of the people of the United States," and the elected were to be anyone who their "fellow-citizens may confer the representative trust." Id., No. 57, p. 366.  The opportunity to serve as an elected official was "open to merit of every description, whether native or adoptive, whether young or old, and without regard to poverty or wealth, or to any particular profession or religious faith." Id., No. 52, p. 337.  The ideal government would be where one regular citizen represents many other regular citizens.

This idea is repeated throughout the Federalist Papers when Madison refers to elected officials as "fellow-citizens." Id., Nos. 52, 57, 62.  Madison rejected the idea that electors and the elected would be treated by different standards.  While referring to the House he stated: "…[T]hey can make no law which will not have its full operation on themselves [the House of Representatives] and their friends, as well as on the great mass of society.  This has always been deemed one of the strongest bonds by which human policy can connect the rulers and the people together.  It creates between them that communion of interests and sympathy of sentiments, of which few governments have furnished examples; but without which every government degenerates into tyranny." Id. No. 57, p. 367.  Not only were all laws to apply equally to both elected and elector, but

protection of rights extended equally as well. "… [T]he Framers of the first amendment intended also that its protection should extend not to some limited groups but to all citizens." *Law Students Civil Rights Research Council, Inc. v. Wadmond*, 401 U.S. 154, 180 (1971) (BLACK, J., dissenting).

In *New York Times Co. v Sullivan, 376 U.S. 254 (1964),* Justice Brennan, writing for the majority, stated:

> The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v United States, 354 U.S. 476* …Mr. Justice Brandeis, in his concurring opinion in *Whitney v California, 274 U.S. 357, 375-76*, gave the principle its classic formulation:

> > "Those who won our independence believed… that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they know that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope, and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; **that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies**; and that the fitting remedy for evil counsels is good ones. **Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law—the argument of force in its worst form.** Recognizing the occasional tyrannies of governing majorities, **they amended the Constitution so that free speech and assembly should be guaranteed.**

*New York Times Co. v Sullivan, 376 U.S. at 268 (emphasis added).*

The First Amendment does not apply unequally to different classes. An elected or appointed official, (as well as his constituents), does not forfeit his first amendment

freedoms as a prerequisite to taking office. TOMA, however, does this, singling out public officials for actual or threatened prosecution, for merely discussing public issues, or receiving correspondence or email—the protected exercise of first amendment rights. The District Court is in error when it ruled that public official's political speech "…is not protected by the First Amendment from the restriction imposed by the Texas Open Meetings Act." Op. p. 9.

In 1966 a unanimous United States Supreme Court upheld the idea that elected officials have the same free speech rights as the ordinary citizen. *Bond v. Floyd*, 385 U.S. 116 (1966). In *Bond*, a Georgia man had been elected to the Georgia House of Representatives but had been excluded by other members of the House based on his statements opposing the Vietnam War. The Court concluded that such a measure was a violation of Bond's free speech. *Id.* In the case the state attempted to argue that while "a citizen might be protected by his First Amendment rights, the State may nonetheless apply a stricter standard to its legislators." *Id.* at 133. The Court explicitly rejected such an idea. *Id.* The court reasoned that while a state may require something of its elected officials not required of its remaining citizens, such as an oath, this power does not extend to limiting the legislators' capacity to discuss views. *Id.* at 135.

The Supreme Court's decision that elected officials have the same free speech rights as regular citizens was guided by the proposition that "debate on public issues should be uninhibited, robust, and wide-open." *New York Times v. Sullivan*, 376 U.S.

19

254, 270 (1964). The Court went on to support the idea that elected officials and electors have equal rights and protections under the law:

> "The State argues that the New York Times principle should not be extended to statements by a legislator because the policy of encouraging free debate about governmental operations only applies to the citizen critic of his government. We find no support for this distinction in the New York Times case or in any other decision of this Court. The interest of the public in hearing all sides of a public issue is hardly advanced by extending more protection to citizen-critics than the legislator."

*Bond*, at 136.

Since 1966, *Bond* has been cited positively by a number of different courts: "The Court rejected a differing first amendment standard for publicly-elected officials." *Miller v. Town of Hull, Massachusetts*, 878 F.2d 523, at 532-33 (1st Cir. 1989). "The Supreme Court specifically rejected the argument that elected officials have lesser first amendment rights than ordinary citizens." *Id.,* at 534. "The Court in *Bond* stated in dicta that if the statements in question had been made by a private citizen, they would have been protected by the first amendment." *Vacca v. Barletta*, 753 F.Supp. 400, at 405 (D. Mass, 1990). "*Bond* squarely holds that legislators enjoy the same degree of first amendment protection as private citizens." *Gewertz v. Jackson*, 467 F. Supp. 1047, at 1058 (D.C.N.J., 1979).

Our Founding Fathers created a government to be made up of ordinary citizens. The idea that elected officials and voters were to be held to different standards was a concept foreign to them. It is clear in their writings and Supreme

Court rulings that this idea remains true today. It is not a crime for ordinary citizens to email each other about pressing public issues. TOMA makes it a crime for city council members to do the same thing. The First Amendment applies to all. Elected or appointed officials have the same First Amendment rights as their fellow citizens, but TOMA impermissibly singles out a certain class of persons, and certain speech, and bans it.

### III.    TOMA § 551.144 criminalizes conduct that merely has the appearance of the appearance of corruption and is therefore overbroad.

In its zeal to attack corruption, the State has attacked core speech rights in contravention of the First Amendment. Open meetings laws, like campaign finance regulations, attempt to limit public corruption by eliminating actions that have the appearance of corruption. However, §551.144 criminalizes actions that are far afield from corruption, and it is far more dangerous to speech interests than campaign finance regulation.

### A.    TOMA broadly proscribes exchanges of information because exchanges of information can appear to be like meetings.

In campaign finance regulation, the Supreme Court has accepted that an exchange of money with a candidate has the appearance of bribery. Campaign contributions have an unmistakable element of speech (or surrogate speech – the funding of surrogates to address the issues one deems important). Nonetheless, the Court has permitted regulations aimed at protecting public confidence in

government by eliminating the appearance of corruption, even if the regulation forces disclosure of the donor or reduces speech on public issues. *McConnell v. FEC*, 540 U.S. 93, 136-137; *FEC v. Nat'l Right to Work Comm.*, 459 U.S. 197, 208 (1982); *Buckley v. Valeo*, 424 U.S. 1, 26-27 (1976). Permitting the government to regulate speech to avoid the appearance of corruption is not without controversy. See, e.g., *McConnell*, 540 U.S. at 268-269 (Thomas, J., dissenting); 540 U.S. at 259-260 (Scalia, J., dissenting). This Court has noted that such regulations must "'survive exacting scrutiny.'" *Center for Individual Freedom v. Carmouche*, 449 F.3d 655, 663 (5th Cir. 2006) (quoting *Buckley v. Valeo*, 424 U.S. at 64).

In open meetings laws, the government acts from the same controversial premise. Because closed meetings might lead to decisions that are result of bribery or undue influence, they have the appearance of corruption; states may prohibit closed meetings to eliminate that appearance. However, Texas goes far beyond prohibiting closed meetings; Texas criminalizes any exchange of information involving a quorum of the public body because an exchange of information might look like a closed meeting, and a closed meeting might indicate corruption.

The State's criminal proscription is too remote from the interest it ostensibly forwards to survive First Amendment scrutiny. While courts have, with some noteworthy reluctance, approved campaign finance rules to eliminate the appearance of corruption, they have not and should not approve laws that

criminalize such basic First Amendment speech as the receipt or delivery of an e-mail on the tenuous theory that eliminating an exchange of information eliminates actions that look like meetings which in turn could reflect bribery or corruption.

> **B.      Section 551.144 criminalizes a broad set of protected speech activity, is substantially overbroad, and violates the First Amendment.**

The overbreadth doctrine permits Monclova and Rangra to challenge § 551.144 if it adversely affects a substantial amount of protected speech activity. "In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982). *See also Kolender v. Lawson*, 461 U.S. 352, 359, n. 8 (1983). "Criminal statutes must be scrutinized with particular care; those that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *City of Houston v. Hill*, 482 U.S. 451, 459 (1987) (citing *Winters v. New York*, 333 U.S. 507, 515 (1948)).

> **1.      Section 551.144 is substantially overbroad.**

An accepted and often necessary part of overbreadth analysis involves studying the ways in which the challenged statute may chill free speech. *See e.g., Reno v. ACLU*, 521 U.S. 844, 877 (1997) (finding overbreadth when the

challenged statute would have allowed prosecutions of parents for providing birth control information to or permitting the viewing of "indecent" material by their 17 year old children). As this Court has said, "With regard to facial First Amendment challenges, the challenger need only show that a statute or regulation 'might operate unconstitutionally under some conceivable set of circumstances.'" *Center for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

In the present case, no free-floating speculation is needed to see the phenomenal breadth of the statute. The finest example of overbreadth is this case itself where the receipt of an e-mail suffices to violate the law. R. 131.

One additional example, drawn from the Attorney General's Office TOMA Training Video, Trial Exhibits 4a and 4b, will show how broadly the State applies § 551.144. In the training video, the instructor presents a series of vignettes to illustrate potential problems. In vignette number eight, a quorum of the school board attends a meeting of the city council in which the council will discuss a matter of mutual concern and authority. The board members sit quietly through the meeting and no violation occurs. But, in vignette number nine, the instructor presents the same scenario except that one member of the school board addresses the city council. Now, there is a violation.

The video's instructor does not describe the source of the offense or its implications, but those can be discerned through an analysis of the statute. There are only two criminal sections to TOMA. Section 551.143 requires a conspiracy, and the facts presented included nothing to support a conspiracy conviction. Section 551.144 is the only provision that could be violated in vignette number nine. Section 551.144 requires a quorum and a meeting, but the meeting requirement is satisfied by the participation of any one member of the school board, and the strict liability crime attaches to every board member at the meeting. Thus, because one member spoke, the entire quorum of the school board has committed a crime.

When a person can be held strictly liable for a crime by receiving an e-mail or attending a public meeting where a fellow board member unexpectedly speaks out, the First Amendment is endangered. "Far from providing the breathing space that First Amendment freedoms need to survive, the [statute] is susceptible of regular application to protected expression.… [T]he [statute] is substantially overbroad." *City of Houston v. Hill*, 482 U.S. 451, 466-467 (1982) (citations omitted).

2.     **The District Court imposed its own interpretation of state law on state authorities and failed to apply the First Amendment overbreadth doctrine properly.**

The District Court misread this Court's decision in *United States v. Wallington*, 889 F.2d 573 (5th Cir. 1989) and failed to apply the overbreadth doctrine properly. In *Wallington*, this Court rejected an overbreadth challenge to 18 U.S.C. § 1905. The District Court quoted the Wallington opinion: "[W]here there are a substantial number of situations to which a statute may validly be applied, we eschew reliance on the overbreadth doctrine." R. 463 (Conclusions of Law ¶21) (quoting *Wallington*, 889 F.2d at 576). However, the District Court failed to include the very next sentence from *Wallington*: "As an important corollary to this principal, a federal statute should be construed narrowly to avoid overbreadth." *Id. See also United States v. X-Citement Video*, 513 U.S. 64, 78 (1994).

The *Wallington* Court acknowledged that a literal reading of the federal statute would be overbroad. 889 F.2d at 576. However, it looked to Congressional intent and interpreted the federal statute to avoid the "seemingly absurd" and overbroad construction Wallington suggested. *Id.*

The proper standard for overbreadth analysis of a state statute that has already been interpreted by state authorities is different. *City of Chicago v. Morales*, 527 U.S. 41, 61 (1999). For reasons of comity, federal courts may not impose their own interpretation of state law against the will of the state. *Johnson v.*

*Fankell*, 520 U.S. 911 (1997). This rule of deference applies to the state's highest court and can also apply to opinions from the intermediate state courts. *Kolender v. Lawson*, 461 U.S. 352 (1983).

In *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992), the Supreme Court expressed the proper standard for approaching non-federal enactments, "In evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance including its own interpretation and implementation of it." 505 U.S. at 131. The same standard is applied to the laws of a state.

In the present case, the state law is defined in the broadest possible terms both by the highest court of the state and by the state's attorney general. An attorney general's limiting construction of a statue may not be entitled to deference when other state authorities retain the power to interpret the law more broadly and prosecute potentially protected speech activity. *Virginia v. American Booksellers Ass'n*, 484 U.S. 383 (1988). However, absent this specific circumstance, the Courts of Appeals have deferred to state attorneys general on matters of state law. *Banks v. Armontrout*, 872 F.2d 237, 239 (8th Cir 1989); *Huggins v. Isenbarger*, 798 F.2d 203, 207-209 (7th Cir. 1986) (Easterbrook, J., concurring) (cited with approval at *Arizonans for Official English v. Arizona*, 520 U.S. 43, 76 n.30 (1997)).

In the present case, the Attorney General's interpretations of the state law expressly reject possible narrowing constructions and lead to expansive threats on protected speech activity. For the District Court to ignore the State's interpretations of state laws and to follow its own idiosyncratic, non-binding view leaves the State free to threaten prosecution and achieve maximum speech suppression. The Court expressly forbade this in *Dombrowski v. Pfister*, 370 U.S. 479 (1965). "Because of the sensitive nature of constitutionally protected expression, we have not required that all of those subject to overbroad regulations risk prosecution to test their rights. For free expression – of transcendent value to all society, and not merely to those exercising their rights – might be the loser.' *Id*. at 486.

**3.    The overbreadth doctrine protects Monclova and Rangra from an unrestrained power to threaten prosecution for violating § 551.144.**

The District Court apparently rejected the overbreadth argument based on repeated assertions by the State that it could be trusted not to abuse the expansive power it asserts through § 551.144. District Attorney Brown testified that he has "unchecked" and "absolute discretion" to determine whether an exchange of information violates the law. Trial Transcript at 36. However, he noted in some instances that he would exercise that absolute power gently. Trial Transcript at 37 ("[Y]ou can have a violation of the statute but not have a prosecutable case"), 37 ("I probably wouldn't take that case to the grand jury."). See also Trial Transcript

at 202 ("These hypotheticals we've heard about, most of which haven't come up and are never prosecuted, are at the margins.").

Additionally, the State asserted that its legislative choices should trump Monclova and Rangra's free speech rights. Trial Transcript at 202 ("The fact that Texas imposes criminal sanctions just shows that the people of Texas and their elected representatives are very serious about this statute.[2] ... The legislature has made its policy choice, and that public policy choice should not be undone through the vehicle of a constitutional challenge.").

Finally, the District Court and the State rejected the overbreadth argument because the First Amendment does not apply to public officials. R. 461-462; Trial Transcript at 198.

These arguments are reminiscent of *Board of Airport Commissioners v. Jews for Jesus*, 482 U.S. 569 (1987), where the airport banned all First Amendment activities in its facilities. The Supreme Court rejected the attempt. "Such a law that 'confers on police a virtually unrestrained power to arrest and charge persons with a violation' of the resolution is unconstitutional because '[t]he opportunity for abuse, especially where a statute has received a virtually open-ended interpretation,

---

[2] The assertion that the Texas legislature is serious about open meetings does not match its performance. In its recent session, one representative moved to amend the House rules to apply the criminal penalties of §§ 551.143 and 551.144 to the House. The members recoiled at the prospect of being subjected to the harsh criminal sanctions and indeterminate liability, and they tabled the amendment. The House Journal account of the proposal and the ensuing discussion are attached hereto as Appendix A.

is self-evident.'" 482 U.S. at 576 (quoting *Lewis v. City of New Orleans*, 415 U.S. 130, 135-136 (1974) (Powell, J., concurring)).

## IV.    Section 551.144 is unconstitutionally vague

In the First Amendment arena, overbreadth and vagueness are twin doctrines designed to prevent government impositions on free speech. Vagueness is a doctrine that applies to all criminal laws. The standard of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement. *Winters v. New York*, 333 U.S. 507, 515 (1948). The vagueness doctrine applies with even greater vitality when free speech is affected by the vague criminal law.

### A.    The trial court applied the wrong vagueness standard.

The trial court applied this Court's vagueness standard from *Ford Motor Co. v. Texas Department of Transportation*, 264 F.3d 493 (5th Cir. 2001), and held that § 551.144 cannot be vague unless "no standard of conduct is outlined at all; when no core of prohibited activity is defined." R. 465 (Conclusions of Law ¶26) (quoting *Ford Motor Co.* 264 F.3d at 509).

The problem is that *Ford Motor Co.*, by its own terms, does not apply to this case. Ford challenged a state law governing the relationship between manufacturers and dealers. Ford asserted an array of claims, including vagueness.

This Court recognized that:

> For criminal statutes "we employ the two-part void-for-vagueness test described in *City of Chicago v. Morales*": Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement.

264 F.3d at 507 (quoting *United States v. Escalante*, 239 F.3d 678, 680 (5th Cir. 2001) (quoting *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999))).

The Court then followed by noting that "a less stringent standard is applied to civil statutes that regulate economic activity." *Ford Motor Co.*, 264 F.3d at 507 (citing *Village of Hoffman Estates v. Flipside Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)). Articulating the less stringent standard, this Court then gave the language used by the District Court.

The *Ford Motor Co.* vagueness standard for civil economic regulation is completely irrelevant to Section 551.144, a strict liability criminal statute with substantial impact on speech activities. In fact, just as a lesser vagueness standard applies to civil economic regulations, a "more stringent" vagueness standard applies to regulations of speech. *Medlin v. Palmer*, 874 F.2d 1085, 1090 (5th Cir. 1989).

> The general test of vagueness applies with particular force in review of laws dealing with speech. "[S]tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser."

*Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976) (quoting *Smith v. California*,

361 U.S. 147, 151 (1959)).

> **B.    Under the correct vagueness standard, Section 551.144 fails because it does not provide notice of what it prohibits and it encourages arbitrary enforcement.**

The correct standard for vagueness (not adding the extra stringency required

for speech concerns) is stated in *Kolender v. Lawson*, 461 U.S. 352, 357-358

(1983):

> [T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of the vagueness doctrine 'is not actual notice, but the other principal element of the doctrine - the requirement that a legislature establish minimal guidelines to govern law enforcement.'"

*Kolender v. Lawson*, 461 U.S. 352, 357-358 (1983) (citations omitted).

The Court continued to explain the grave danger posed by a criminal statute

lacking guidelines:

> Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'"

*Kolender v. Lawson*, 461 U.S. 352, 357-358 (1983) (citations omitted).

Section 551.144 is a model example of a penal statute that violates both premises of the vagueness doctrine. It is so unclear that ordinary people cannot decipher what is prohibited, and it lacks minimal guidelines by which to govern law enforcement.

The 2005 Texas legislature passed Texas Government Code § 551.005, mandating a training course to explain the open meetings laws. The bill was passed in response to complaints that the subjects of the law do not understand what it permits and what it does not.

The lack of guidelines is well illustrated by Atty. Gen. Op. JC-0169 (2000). In that instance, the Tarrant County District Attorney needed to ask whether permitting members of the public to comment on matters not specified in the posted meeting notice would violate the law. The responding opinion acknowledged that, on their face, the relevant laws, cases, and opinions would appear to prohibit the practice. *Id*. at 3. However, the Opinion ultimately noted that the practice would remain valid, so long as a term such as public comment was used to describe the time. Nonetheless, the Opinion insists that this will not be adequate notice if the body hearing the public comments hears comments on specific topics it should reasonably be aware are to be raised. *Id*. at 4. Furthermore, responses by members of the body, even to direct inquiries, must be so limited that they do not constitute "deliberation". They may only include a statement of

specific factual information or a recitation of existing policy. *Id.* (citing Texas Government Code § 551.042).

If it takes this many twists and turns to decide whether the public may be permitted to speak at an open public meeting without subjecting the elected officials to criminal sanction, there are no true guidelines limiting law enforcement's discretion. Of course, this was the point made by District Attorney Brown when he claimed "absolute discretion" to interpret § 551.144. Trial Transcript at 36.

Attorney General's Opinion JC-0169 presumes that a person of reasonable intelligence knows and is willing to risk imprisonment based on her knowledge of (1) when to anticipate specific topics being raised in public comments and (2) the difference between deliberation (which can include merely receiving information) and a statement of specific factual information or recitation of existing policy.

Opinion JC-0169 and the overall approach of the State to § 551.144 also presume that no Constitutional principle is offended when a prosecutor has unfettered power to engage in a standardless sweep to pursue his personal predilections. This is not so.

## V.    Public Employment speech cases do not justify the State's threatened criminal prosecution of Monclova and Rangra.

The District Court erred three times over when it decided that the First Amendment does not protect Monclova and Rangra. First, the District Court

mistakenly conflated the employee supervision case of *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006), with criminal prosecutions. Second, the District Court failed to acknowledge the difference between elected public officials, many of whom are volunteers, and public employees. Third, even within the scope of the public employee job action cases, the District Court failed to recognize the clear protection for speech on matters of public concern.

**A.    No prior case from any court in the nation has allowed the government to impose criminal sanctions for public employee speech.**

The Supreme Court's recent *Garcetti* decision is the latest in a line of cases in which the Court has "sought both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions." *Garcetti*, 126 S. Ct. at 1959 (citing *Rankin v. McPherson*, 483 U.S. 378, 384 (1987)). "Underlying [these] cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" *Garcetti*, 126 S. Ct. at 1959 (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)).

The Court in *Garcetti* concluded that "[p]roper application of our precedents thus leads to the conclusion that the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official

responsibilities." 126 S. Ct. at 1961. The applicability of *Garcetti* and its precedent cases to managerial discipline alone is clear. The Court was careful to note in *Connick*:

> "We do not suggest, however, that Myers' speech, even if not touching upon a matter of public concern, is totally beyond the protection of the First Amendment. … We in no sense suggest that speech on private matters falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the State can prohibit and punish such expression …."

461 U.S. at 147. See also *Rankin*, 483 U.S. at 387 ("McPherson's statement … could [not] properly be criminalized at all.").

The point of the public employee speech cases is that adverse job action is a sufficient sanction to trigger First Amendment scrutiny. As the Supreme Court noted in *Pickering v. Board of Education*, 391 U.S. 563 (1968), "the threat of dismissal from public employment is … a potent means of inhibiting speech." 391 U.S. at 574. See also *Garcetti*, 126 S. Ct. at 1958 ("[A] citizen who works for the government is nonetheless a citizen. The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens.").

*Connick* spelled out the countervailing power government exercises as an employer: "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive

oversight by the judiciary in the name of the First Amendment. Perhaps the government employer's dismissal of the worker may not be fair, but ordinary dismissals from government service which violate no fixed tenure or applicable statute or regulation are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable." 461 U.S. at 146.

While the government may terminate employees for mistaken or unreasonable reasons, even sometimes when the termination relates to speech, mistaken or unreasonable reactions to speech cannot be the basis for imprisonment.

Imprisonment is a profoundly more severe sanction than adverse employment action, and the Supreme Court has been especially solicitous of vindicating speech rights when the threatened sanction is criminal. *Ashcroft v. American Civil Liberties Union*, 124 S. Ct. 2783, 2795-97 (2004) (Stevens, J., concurring); *Kolender v. Lawson*, 461 U.S. 352 (1983); *Winters v. New York*, 333 U.S. 507, 515 (1948).

Nothing in the *Pickering-Connick-Garcetti* line of cases, or any other reported case, hints that the public employee speech doctrine permits the State to imprison employees or officeholders.

**B.     Citizens serving in uncompensated elected positions are not public employees and should retain the free speech rights typical of citizens.**

*Garcetti* justified limits on public employees' speech by noting that "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." 126 S. Ct. at 1958.

**1.     Supreme Court precedent establishes the distinction between public employees and elected office holders.**

Of course, with elected office holders in policy-making positions, the "significant degree of control" is in the hands of the electorate and efficient provision of the elected official's services requires that she have as little constraint on her speech as possible. This was the point the Court made in *Wood v. Georgia*, 370 U.S. 375 (1962): "The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance." *Id.* at 395. In *Wood*, the Court expressly distinguished elected officials from employees. "Petitioner was not a civil servant, but an elected official, and hence this is not a case like *United Public Workers v. Mitchell*, 330 U.S. 75 [(1947)], in which this Court held that Congress has the power to circumscribe the political activities of federal employees in the career public service." *Wood v. Georgia*, 370 U.S. at 395, n.21.

The notion that elected officeholders have diminished protection under the First Amendment was rejected by a unanimous Supreme Court in *Bond v. Floyd*, 385 U.S. 116 (1966). "[W]hile the State has an interest in requiring its legislators to swear to a belief in constitutional processes of government, surely the oath gives it no interest in limiting its legislators' capacity to discuss their views of local or national policy. The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy." *Id*. at 135-136. No case since *Bond* has questioned the rule stated there.

> 2.     **The trial court failed to acknowledge the elected office holder status of Monclova and Rangra because it misread this Court's decision in Rash-Aldridge.**

Despite the clear binding precedent to the contrary, the District Court stated that "[f]or the purposes of determining what constitutes protected speech under the First Amendment, there is no meaningful distinction among public employees, appointed public officials and elected public officials." R. 461 (Conclusions of Law ¶14). The District Court purported to be following this Court's decision in *Rash-Aldridge v. Ramirez*, 56 F.3d 117 (5th Cir. 1996) (per curiam). But its conclusion indicates a profound misreading of *Rash-Aldridge*.

*Rash-Aldridge* concerned a Laredo city council member who was additionally appointed by the city council to serve on the local Metropolitan

Planning Organization ("MPO"). During her tenure on the MPO, a dispute arose regarding highway access to the international bridge into Mexico. Rash-Aldridge and the city council disagreed as to which plan to use. The council passed two resolutions to express support for the plan they preferred, but Rash-Aldridge refused to support that plan. Since Rash-Aldridge failed to support the council's preferred plan, the council removed her from the MPO, not the city council, and Rash-Aldridge filed her suit. 56 F.3d at 118.

This Court responded by acknowledging the fundamental tenet of responsibility that applies to appointive and elective office. "This case has to do with Ash-Aldridge's failure as the appointed representative of the Laredo, Texas, city council, to abide by the council's wishes during her term on a metropolitan planning board." 56 F.3d at 118. Given that her role there was to represent the council, the Court had no difficulty acknowledging the council's right to remove her. *Id*. *See also id*. at 120 ("[W]here the legislator is serving as an appointee, the prerogatives of office are not the same.").

The Court expressly distinguished Rash-Aldridge's removal from the appointed planning board from any action against her city council seat. *Id*. at 118 ("Her capacity as an elected official was not compromised because the council did not try to remove her from her seat on the council nor take away any privileges of that office because of what she said or did."). *See also Miller v. Hull*, 878 F.2d

523, 532 (1st Cir.), *cert. denied*, 493 U.S. 976 (1989) ("Although we have found no cases directly on point, probably because it is considered unassailable, we have no difficulty finding that the act of voting on public issues by a member of a public agency or board comes within the freedom of speech guarantee of the first amendment. This is especially true when the agency members are elected officials. There can be no more definite expression of opinion than by voting on a controversial public issue.").

In the present case, the State seeks to criminalize the routine work required by the office to which the voters of Alpine elected Monclova and Rangra. This is precisely what the Court distinguished in *Rash-Aldridge*. For Rash-Aldridge to have First Amendment protection from removal for her votes would have created a "First Amendment found tenure", 56 F.3d at 120, that would interfere with the prerogatives of voters and appointing officers. For Monclova and Rangra not to have First Amendment protection ignores the need for communication to serve their policy-making role and would directly "implicat[e] … [their] fundamental rights as … elected official[s]", 56 F.3d at 119, and would also interfere with the voters' prerogatives.

### 3.     The trial court also misread Kansas law.

The District Court also relied on *State ex rel. Murray v. Palmgren*, 231 Kan. 524, 646 P.2d 1091 (1982), to reject Monclova and Rangra's appeal to the First Amendment. R. 461 (Conclusions of Law ¶16).

In *Palmgren*, a dispute arose regarding the construction of a hospital in Thomas County, Kansas. The county commissioners, who also served as the hospital board trustees, arranged for three closed meetings and both held discussions and made decisions in those meetings. In fact, the Kansas trial court found that "Appellants knowingly held three prearranged meetings for the purpose of discussing, conducting and transacting governmental affairs and business. A majority of a quorum of the governmental body was present each time but none of the three meetings were open to the public. 646 P.2d at 1101.

The Kansas court's express finding of scienter is precisely what is fatally missing from the Texas statute and the State's threatened prosecutions in this case. The Kansas court interpreted the "knowingly" standard in its law to provide for general intent, and this was met by the commissioners who knew they were meeting. Furthermore, the express findings of the Kansas court would satisfy the intent requirement in the conspiracy provision of §551.143. And *Palmgren* is distinguished in another key way; the county commissioners in *Palmgren* were never threatened with imprisonment for their actions.

The threatened prosecutions in this case, however, are under § 551.144 which imposes strict criminal liability. The Texas Court of Criminal Appeals has interpreted "knowingly" so that council members do not need to know that a meeting has occurred only that they have received information. *Tovar v. State*, 978 S.W.2d 584 (Tex. Crim. App. 1998) (en banc); *see also* R. 131. This Court is bound by the state court interpretation.

### 4. Cogent policy reasons support broadly protecting elected officeholders' First Amendment rights.

There are strong policy reasons why public officeholders should not be given a lesser status under the First Amendment. The decentralized American system of government relies greatly upon the volunteer efforts of myriad citizens who serve on public boards, commissions, and councils. These people are not public employees in their public office; they still have their day jobs. To argue that they may be subjected to criminal sanctions if they happen to step across an indeterminate line will discourage most citizens from being willing to serve in these capacities. Such risky public service could adversely affect their regular employment; most employers could not accommodate a leave of absence while the employee is in jail for six months after offending the local district attorney by speaking her mind or listening to others do so. In fact, a basic cost-benefit analysis says that the citizens who will be most willing to risk their personal liberty for an unpaid position are those for whom the risk is outweighed by an opportunity for

personal aggrandizement. These, of course, are the very people who should not be serving on governmental bodies.

### C.    The Alpine Water Project was a matter of public concern; therefore, reading or expressing opinions related to it is protected speech activity even for public employees.

The District Court held that the speech at issue in this case had no First Amendment protection. R. 461 (Conclusion of Law ¶14). That statement misconstrues even the public employee cases, which consistently protect speech on matters of public concern and balance those speech interests with the government employers' interests. *Pickering v. Board of Education*, 391 U.S. 563 (1968).

TOMA broadly prohibits a vast array of exchanges of information, including the passive receipt of information, so long as the exchange relates to public business or public policy. If then, for some reason, the public employee cases do apply to Monclova and Rangra, the very key that triggers § 551.144's application – public concern – also triggers First Amendment protection under the *Pickering* balance.

This case addresses speech on matters of public concern. Questions relating to city water projects, whether special meetings should be held to discuss such projects, and expanding the number of engineers who will present proposals at the public meetings on the projects are all topics that concern the public. They are all topics on which any member of the public could freely receive or disseminate

information, and threatening to imprison public officeholders for receiving and disseminating the same information violates the officeholders' free speech rights.

Even public employees have a right to speak freely on matters of public concern. They cannot be subjected to adverse employment decisions based on their speech on such issues. *Pickering*, 391 U.S. at 575. The one narrow exception to this principle arises when the public employer is exercising supervisory authority over the work of the public employee and that work itself contains speech on matters of public concern. *Garcetti*, 126 S. Ct. at 1960-1961. The fact that the speech relates to work is not sufficient, 126 S.Ct at 1959; job action is only permitted when the government is reviewing the speech in its role as supervisor to its employees. Even then, the principle is not that the speech has lost its protection but that the government has a paramount interest in supervising the direct work product of its employees.

> Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission. Ceballos' memo is illustrative. It demanded the attention of his supervisors and led to a heated meeting with employees from the sheriff's department. If Ceballos' superiors thought his memo was inflammatory or misguided, they had the authority to take proper corrective action.

*Garcetti*, 126 S. Ct. at 1960-1961.

In the present case, the Appellants are not subject to employer discipline, for the only persons to whom they answer are the voters whom they represent. Neither the Attorney General nor the District Attorney is the supervisor of the Alpine city council. Even if they perform some duty relative to the city council by ensuring that the law is upheld, the action the State seeks here is not analogous to the job action permitted by the public employee cases.

Because the supervisors of elected officials are the voters, *Garcetti* does not apply to Monclova and Rangra. Absent that supervisory relationship, their speech – whether listening or speaking, reading or writing – on matters of public concern has First Amendment protection. That First Amendment protection requires that the Court consider the criminal nature of the law, the threatened penal sanction, the law's overbreadth and vagueness, and the readily available but untapped alternative means – including § 551.143 – that the State could use to vindicate its interests.

### VI.    The Valid Interests Behind TOMA Are Not Inextricably Tied to the Current Law or Its Interpretation.

Monclova and Rangra do not and have never challenged the laudable, original goal of TOMA. They have, however, maintained consistently that TOMA as authoritative construed by Texas violates the First Amendment. The District Court implicitly upholds the statute on the ground that these Constitutional

infringements are a necessary evil, apparently believing that open meetings laws cannot function without strict criminal liability. This is not so.

## A.    TOMA is Unique among Open Meetings Laws in Its Breadth

Thirty-four other states, as listed in the Appendix to the Attorney General's Motion to Dismiss, R. 150-151, have open meetings laws. However, they all differ markedly from the Texas Open Meetings Act. Twenty-one of the thirty-four states remedy violations of the act without a criminal sanction, opting instead for injunctions or civil penalties directed either at the governmental body or its individual members.

> *See* Alaska Stat. §§ 44.62.310 – 44.62.312; Ariz. Rev. Stat. Ann § 38-431; Ark. Code Ann §§ 54950 - 54960.5; Conn. Gen. Stat. Ann § 1-206; Fla. St. Const. Art. I, § 24(b); Idaho Code Ann. §§ 67-2341 - 67-2347; Ind. Code Ann. §§ 5-14-1.5-1 – 5-14-1.5-8; Ky. Rev. Stat Ann. §§ 61.810 - 61.850; Me. Rev. Stat. Ann. Tit. 1, § 1005; Md. Code Ann., State Gov't §§ 10-501 – 10-502; Mass. Gen. Laws Ann. Ch. 30A, §§ 11A – 11A½; Minn. Stat. Ann. §§ 13D.01 – 13D.07; Miss. Code Ann. §§ 25-41-1 – 25-41-17; Mo. Ann. Stat. §§ 610.010 – 610.200; N.Y. Pub. Off. Law §§ 100 – 111; Ohio Rev. Code Ann. § 121.22; Or. Rev. Stat. §§ 192.610 – 192.695; R.I. Gen. Laws § 42-46-1; Utah Code Ann. § 52-4-1; Wash. Rev. Code Ann. § 42.30; Wis. Stat. Ann. § 19.81.

Thirteen states have available criminal sanctions, but in five of the states with criminal sanctions, the sanction is only a fine.

> *See* Ga. Code Ann. § 50-14-6; 65 Pa. Cons. Stat. Ann. §§ 701-716; Vt. Stat. Ann. tit. 1, § 310; W. Va. Code Ann. 6-9-A1; Wyo. Stat. Ann. §§ 16-4-401 – 16-4-408.

Seven of the eight with a potential sanction of imprisonment have much shorter sentences.

> *See* Cal. Gov't Code §§ 54950 – 54950.5, Colo. Rev. Stat. Ann. § 24-72-201, Neb. Rev. Stat. §§ 610.010 – 610.200, Nev. Rev. Stat. §§ 241.010 – 241.040, N.D. Cent. Code §§ 44-04-01 – 44-04-23, S.C. Code Ann. §§ 30-04-60 – 30-4-110, S.D. Codified Laws § 1-25-1.

The only state with a potential imprisonment that matches or exceeds that in TOMA is Oklahoma, with a one-year jail term. *See* Okla. Stat. Ann. tit. 25, § 314.

Even though the Oklahoma statute provides for a more severe sanction, the statute mitigates that severity by having a significantly more closely-drawn statute to avoid infringing First Amendment rights. Under the Oklahoma open meetings act, a meeting is defined as the "conducting of business of a public body by a majority of its members being personally together." Okla. Stat. Ann. tit. 25 § 304. In short, the Oklahoma Open Meeting Act has a tougher jail term than TOMA, but it is drafted much more narrowly and avoids issues of overbreadth and vagueness.

Most states other than Oklahoma, even with less stringent penalties, have been careful to avoid the myriad flaws in TOMA. For example, to violate California's Open Meetings Act (Brown Act), there must be a collective decision, commitment or promise, or actual vote taken at a closed meeting. Cal. Gov't. Code § 54952.6. Nevada's law only applies if there has been an action taken, meaning a decision, commitment or promise, or affirmative vote. Nev. Rev. Stat. 241.015(1)(a)-(d).

Not one of the thirty-four other states with open meetings laws defines meeting as expansively as Texas, nor does any other state punish the mere receiving or giving of information or the asking or receiving of questions from a third person.

**B.     Recent case law also shows that less speech suppressive means are available to vindicate the State's interests**

The Virginia Supreme Court recently had an opportunity to consider whether e-mail communications constitute a meeting under Virginia's Freedom of Information Act, which, while not in the State's Appendix, is similar to TOMA in that it ensures "free entry to meetings of public bodies wherein the business of the people is being conducted." Va. Code Ann. § 2.2-3700 (2005). The Virginia court looked at the nature of e-mail communication and the definition of assemble, which means to bring together. *Beck v. Shelton*, 593 S.E.2d 195, 199 (Va. 2004). While reserving for another day whether electronic correspondence, such as instant messaging, done rapidly over a short time span could violate the Act, the court held that "the trial court erred in its determination that the e-mail communications at issue in this case constituted a 'meeting' under FOIA." *Id*. at 200. The Virginia court reasoned that simultaneity is a prerequisite to having an assemblage. *Id*. at 199.

While not binding on this Court, the *Beck* opinion does show that other states, unlike Texas, have placed limiting constructions on their open meetings laws to prevent interfering with elected officials' First Amendment rights.

## CONCLUSION

Contrary to the position of the District Court, § 551.144 as authoritatively construed by Texas authorities violates the First Amendment.

Elected officeholders do have First Amendment rights. They may not be subjected to criminal liability for receiving or sending e-mails absent scienter. They may not be threatened with prosecution under overbroad regulations of speech nor may they be forced to risk imprisonment based on guesswork as to what speech the State will or will not prosecute under a vague statute. Cases relating to the supervision of public employees do not justify the threatened imprisonment of elected officeholders. And when criminalizing fundamental speech activity such as receiving and sending e-mail, the State must choose the path that is least restrictive to speech rights.

Ultimately, the State is choosing to sacrifice speech interests for a paltry gain. State law already prohibits conspiracies to evade the open meetings requirements. So, using e-mail, traditional mailings, or any other means of written or oral communication with the intent to evade the open meetings law is proscribed. The State however has interpreted § 551.144 so broadly as to eliminate

the need for the conspiracy provision. Practically every overt act that could further the conspiracy is prohibited as a strict liability crime.

This exchange of speech rights for the prosecutor's ease – a mere mess of pottage – is barred by the First Amendment.

For the foregoing reasons, this Court should reverse the judgment of the trial court and remand with direction to enter a declaratory judgment striking Texas Government Code §551.144 as violative of the First Amendment.

Respectfully submitted,

_____
DICK DeGUERIN
Texas Bar No. 05638000
DeGUERIN, DICKSON & HENNESSEY
1018 Preston Avenue, Seventh Floor
Houston, Texas 77002
Telephone: 713-223-5959
Facsimile: 713-223-9231

ARVEL RODOLPHUS PONTON III
Texas Bar No. 16115170
2301 North Highway 118
P.O. Box 9760
Alpine, Texas 79831
Telephone: 432-837-0990
Facsimile: 432-837-0971

ATTORNEYS FOR PLAINTIFFS/
APPELLANTS, AVINASH RANGRA
AND ANNA MONCLOVA

## CERTIFICATE OF SERVICE

I hereby certify that on the ___ day of April, 2007, via United States first class mail, the original and seven true copies of the foregoing Brief for Appellants and an electronic disk containing the Brief have been filed with the Clerk for the United States Court of Appeals for the Fifth Circuit.

> Charles R. Fulbruge III
> Clerk of the Court
> United States Court of Appeals for the Fifth Circuit
> 600 Maestri Place
> New Orleans, Louisiana 70130

I hereby certify that on the ___ day of April, 2007, via United States first class mail, postage prepaid, two true and correct copies of the Brief for Appellants and an electronic disk containing the Brief have been served on the following counsel:

> J. Steven Houston
> P.O. Box 396
> Marathon, Texas 79842
>
> James Todd
> Jeff Rose
> Office of the Attorney General
> State of Texas
> P.O. Box 12548
> Capitol Station
> Austin, Texas 78711

_____
DICK DeGUERIN

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief contains 11,798 words, excluding the parts of the brief excepted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, font size 14, and size 12 for footnotes.

_____

Date

_____

DICK DeGUERIN
Texas Bar No. 05638000

# APPENDIX A

Texas House of Representatives, House Journal, January 12, 2007 (from http://tlo2.tlc.state.tx.us/hjrnl/80r/html/80RDAY04FINAL.HTM), pages 153-156:

Representative Y. Davis offered the following amendment to **HR 3**:

Amend **HR 3** on page 53, between lines 18 and 19 by inserting the following:

"(d) Subchapter G, Chapter 551, Government Code, applies to the posting of notices under these rules."

## AMENDMENT NO. 17 –

## STATEMENT OF LEGISLATIVE INTENT

REPRESENTATIVE HARTNETT: Ms. Davis, does this mean if the members of my committee step behind the hall to have a bite to eat, that we have post that?

REPRESENTATIVE Y. DAVIS: No sir. It means that if your committee moves in the back hall and discusses substantive issues that is before the committee and take a vote on it privately, without people being open to that

meeting, that's a violation. You may eat together, but it's when you are discussing the business that's before your committee and taking action on it.

HARTNETT:  Thank you.

Y. DAVIS:  Mr. Speaker, I would hope that this amendment is acceptable to Mr. Solomons in that we are a body that believes in the open meetings process and certainly we ought to be able to comply with the rules that we ask other entities to.

REPRESENTATIVE    SOLOMONS: Mr.    Speaker,    members,    my understanding, and I can leave it to the will of the house, is one point I am going to vote against it, in that as far as I know you are then now subject to criminal penalties and posting notices. As someone who was a chairman, as far as posting notices on the rules, if you make a mistake, you may have to hire a lawyer. You may have to go see some D.A., I guess a local D.A. This has criminal penalties–there's cause and effect here. When you do this, you'll be subject to criminal penalties, and all kinds of things in connection with that, or you can just vote this down. So I'm going to move to table the amendment.

Y. DAVIS:  Thank you, Mr. Speaker, members. They have said that there's a question about if we apply Open Meetings Act enforcement, that we would make it impossible for members of the house to walk in the chamber and

discuss issues. I think that is what you were trying to ask me. This doesn't change what open meetings are, it doesn't change what's currently in law, it just states that the house is subject to penalties that other entities are who violate open meetings rules. That's the problem right now–when we found committees who violate the Open Meetings Act, they're not subject to any punishment, they are just said, "Oh well." So this basically says that we believe in it enough that we would enforce whatever penalties we would enforce on any other public entity.

REPRESENTATIVE DUTTON: Ms. Davis, I'm not sure if I'm for or against this at this point. But what I'm trying to understand is what the effect of applying the Open Meetings Act to this body. Are there any restrictions in terms of quorum, in terms of gathering or coming together or does your amendment limit to only certain applications of the Open Meetings Act?

Y. DAVIS: What we're trying to do with this amendment is basically say that the house of representatives ought to be subject to the Open Meetings Act, so that when we talk about having open meetings for other public entities, it ought to be our committees as well. It ought to be that we are subject to those penalties that we would impose on other public entities if they violate it.

DUTTON:  I understand how you're trying to do it. But let's put it this way, the Open Meetings Act also causes certain groups of people not to be able to come together where there might be effectively a quorum. Would that apply also, under your amendment, to this body?

Y. DAVIS  My amendment deals with applying the same penalties; this does not change how you would do an open meeting.

DUTTON: I'm not suggesting that it does. I'm just trying to be sure that under the Open Meetings Act it prohibits a governmental body or entity from, for example, if there was a five-member commissioner's court, under the Open Meetings Act, three of them couldn't get together to talk about much of anything, as I understand. And in fact to make sure that they don't violate it, much of the time one of them will actually leave and they don't even go to lunch together where there might be three or more. I'm wondering–since that provision you're not changing, I would have to assume that provision would apply to this body also.

Y. DAVIS:  Right, our committees are typically larger than commissioner's courts and commissions that we appoint. Therefore, they are subject to this, so why are we privy to not be subject to it? Why are we wanting to not be subject to it when we oftentimes talk about the importance of this, to open up government, the need to make sure it's transparent so people can know

what's going on? Yet we would leave in place the opportunity to have closed meetings in our legislative process? That's contradictory, as I see it.

DUTTON: I understand what your attempting to do. I'm just thinking that, for example, if my committee, a nine member committee, if I went some place and three of them were present.... For example, if I went to the Cloakroom, and three of my committee members are there and I went in, then four committee members are now there, that would be applicable?

Y. DAVIS: That's really where Open Meetings started, those private meetings at clubs, at country clubs, that was the basis of having open meetings laws. So that deals would not be cut in private. So that if you were at the Quorum Club with six of the nine members on your committee, talking about a particular bill and how you're going to vote on a particular bill, you would probably be in violation. That was the whole basis of having open meetings and open discussion so that the public would be privy to that. But again this bill does not deal with changing anything that the Open Meetings Act does. It just says that you should be subject to it, as all the other public entities are.

DUTTON: I understand that, but what I'm trying to do is go the other way. I'm trying to be sure that the application of the Open Meetings Act to this body doesn't cause some unintended consequences, or what sort of

adjustments would have to be made within this body for us to be in compliance with the law. And are there things that you can tell us that would change in the way that we conduct our business that would change as a result of applying your amendment or adopting your amendment?

Y. DAVIS:  It is my understanding that my amendment just suggests that we as a body would be subject to the same penalties as any other public entity who does not follow the Open Meetings Act.

DUTTON:  That's a violation, but what I'm asking is before the violation in terms of practical application of the Open Meetings Act to us, are there things that you can foresee and tell us that this body would have to change as a result of that?

Y. DAVIS:  I cannot, because I think that we have said as a body and we have many discussions about the importance of open government, transparency and that we don't want secret ballots, that we want this and we want that. So why is it a problem to be talking about having the same penalties afforded to us that we're going to have applied to other people that are not having open meetings? Having been on a committee when they've had private meetings and not been invited to it, it prohibits you from representing your constituents, and, therefore, it's important that we don't allow this to happen, that we do all we can to protect the interests of the

citizens. And that's the only way that I know from my experiences that if somebody is subject to the penalties of it.

DUTTON: I understand that. I guess that I'm not making myself clear. What I'm trying to figure out is, if we adopt this, what are we going to have to do differently?

Y. DAVIS: We would be treating ourselves as we are treating others.

DUTTON: That I understand. What I'm talking about though is are we going to have to walk and talk any differently? Are we going to have to meet any differently? Are we going to have to in terms of, for example, if someone were to have a session for all the legislators, could we all go under the Open Meetings Act? Could we all attend as a body? If my committee were invited to go to a facility to attend a juvenile justice facility someplace, could my committee all go and listen to folks, even though we were not having a formal meeting and not be subject to the Open Meetings Act or the penalties for violating the Open Meetings Act? If you could, walk with me through in applying this Open Meetings Act, are there things we would have to do differently? I'm not sure that I know either, and that's why I'm asking if you have thought about whether or not we're going to have to change.

Y. DAVIS: Mr. Dutton, I'm accustomed to being treated like my constituents. So, they have to comply. I don't know why we need to figure out what we need differently. I don't know what we need differently.

DUTTON: What will we have to do differently if we apply this?

Y. DAVIS: I'm not aware of anything.

DUTTON: Okay, thank you.

Representative Solomons moved to table Amendment No. 17.

A record vote was requested.

The motion to table prevailed by (Record 20): 91 Yeas, 37 Nays, 1 Present, not voting.