No. 06-51587

# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘 𝖋𝖔𝖗 𝖙𝖍𝖊 𝕱𝖎𝖋𝖙𝖍 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

---

AVINASH RANGRA AND ANNA MONCLOVA,
*Plaintiffs-Appellants,*

v.

FRANK BROWN AND GREG ABBOTT,
*Defendants-Appellees.*

---

On Appeal from the United States District Court
Western District of Texas, Pecos Division

---

## SUPPLEMENTAL BRIEF OF APPELLEES

---

GREG ABBOTT
Attorney General of Texas

C. ANDREW WEBER
First Assistant Attorney General

DAVID S. MORALES
Deputy Attorney General
for Civil Litigation

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
[Tel] (512) 936-1700
[Fax] (512) 474-2697

JAMES C. HO
Solicitor General
Texas Bar No. 24052766

SEAN D. JORDAN
Deputy Solicitor General

THOMAS M. LIPOVSKI
Assistant Solicitor General

PETER HANSEN
REED N. SMITH
Assistant Attorneys General

COUNSEL FOR APPELLEE GREG ABBOTT

**Additional Counsel Listed on Inside Cover**

J. Steven Houston
P.O. Box 388
Marathon, Texas 79842
State Bar No. 10054300
[Tel.] (432) 386-6054
[Fax] (432) 386-4203

COUNSEL FOR APPELLEE FRANK BROWN

## TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    I.      Plaintiffs Have Lost Standing To Pursue This Appeal Because
            The Dispute Is Now Entirely Hypothetical—TOMA No Longer
            Applies To Them, And It Does Not Forbid What They Claim It
            Forbids . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          A.    Plaintiffs Have Lost Their Standing To Pursue This Appeal
               Because TOMA Indisputably No Longer Applies To
               Rangra And Monclova . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          B.    Plaintiffs' Attempt To Manufacture Standing By
               Substituting New Parties In Place Of Rangra And
               Monclova Is Untimely—And In Any Event Based On The
               Dubious Notion That TOMA Impacts Not Plaintiffs' Own
               First Amendment Rights, But Those Of The City . . . . . . . . . 11

          C.    Because Plaintiffs Have Lost Standing To Pursue Their
               Claims, The Court Should Dismiss The Appeal As Moot . . . 19

          D.    This Case Is Moot For An Additional Reason:  Plaintiffs
               Are Now Essentially Seeking An Advisory Opinion To
               Resolve A Purely Hypothetical Dispute—TOMA Forbids
               Only Knowing Participation In A Closed Meeting, Not The
               Passive Receipt Of E-mails . . . . . . . . . . . . . . . . . . . . . . . . . 22

II.   Plaintiffs Cannot—And Appear Not To—Challenge What TOMA
      Actually Does, Because It Is a Reasonable, Content-Neutral Time
      Place Or Manner Regulation That Furthers Open Government . . . . 27

      A.   The Court Need Not Address The Constitutional Standard
           That Applies To Open Meeting Laws, Because Plaintiffs
           Have Conceded That States May Forbid Governmental
           Bodies From "Conducting Public Business Behind Closed
           Doors" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      B.   Every Legislature In The Nation Has Enacted—And Courts
           Across The Country Have Consistently Upheld—Open
           Meeting Laws Under The First Amendment . . . . . . . . . . . . . 29

      C.   The Broad Legislative And Judicial Consensus Favoring
           Open Meeting Laws Is Understandable—Because
           Requiring Government Officials To Conduct Public
           Business In Public Furthers, Rather Than Frustrates,
           Fundamental First Amendment Values . . . . . . . . . . . . . . . . 33

      D.   Open Meeting Laws Satisfy Traditional First Amendment
           Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

           1.   Open Meetings Laws Are Content-Neutral, Time,
                Place, And Manner Regulations Under *Ward v. Rock
                Against Racism* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

           2.   Open Meetings Laws Also Satisfy Strict Scrutiny
                Under The Plurality Opinion In *Burson v. Freeman*
                In Any Event . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

      E.   The Text Of TOMA Is Typical Of Open Meeting Laws
           Across The Nation And Is Neither Overbroad Nor Vague . . 53

      F.   Plaintiffs' Analogy To Campaign Finance Restrictions Is
           Not Only Inapposite—It Is Self-Defeating . . . . . . . . . . . . . 55

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

# TABLE OF AUTHORITIES

*Acker v. Tex. Water Comm'n,*
  790 S.W.2d 299 (Tex. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Aguirre v. State,*
  22 S.W.3d 463 (Tex. Crim. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Arizonans for Official English v. Arizona,*
  520 U.S. 43 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 27

*Bond v. Floyd,*
  385 U.S. 116 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Bowler v. Ashcroft,*
  46 F. App'x 731 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Brazos Valley Coal. for Life, Inc. v. City of Bryan,*
  421 F.3d 314 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Broadrick v. Oklahoma,*
  413 U.S. 601 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Buckley v. Valeo,*
  424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 53, 55

*Burson v. Freeman,*
  504 U.S. 191 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Cable News Network v. Am. Broad. Cos.,*
  518 F. Supp. 1238 (N.D. Ga. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Calder v. IRS,*
  890 F.2d 781 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Center for Auto Safety v. Cox*,
   580 F.2d 689 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Coal. for Econ. Equity v. Wilson*,
   122 F.3d 692 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Cole v. Colorado*,
   673 P.2d 345 (Colo. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 40

*Consol. Edison Co. v. Pub. Serv. Comm'n*,
   447 U.S. 530 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 43, 45-46

*de la O v. Hous. Auth. of City of El Paso*,
   417 F.3d 495 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Detroit Free Press v. Ashcroft*,
   303 F.3d 681 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Dorrier v. Dark*,
   537 S.W.2d 888 (Tenn. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Encore Videos, Inc. v. City of San Antonio*,
   330 F.3d 288 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Fantasy Ranch Inc. v. City of Arlington*,
   459 F.3d 546 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Finger v. Garza*,
   98 F. App'x 326 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*First Nat'l Bank of Boston v. Bellotti*,
   435 U.S. 765 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

*Globe Newspaper Co. v. Superior Court*,
   457 U.S. 596 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-36

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Hamling v. United States,*
    418 U.S. 87 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hays County Water Planning P'ship v. Hays County,*
    41 S.W.3d 174 (Tex. App.—Austin 2001, pet. denied) . . . . . . . . . . . . 3, 32

*Hill v. Colorado,*
    530 U.S. 703 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Horton v. City of Houston,*
    179 F.3d 188 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Illusions-Dallas Private Club, Inc. v. Steen,*
    482 F.3d 299 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

*Jenevein v. Willing,*
    493 F.3d 551 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 38, 44

*Kansas ex rel. Murray v. Palmgren,*
    646 P.2d 1091 (Kan. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 31

*Karcher v. May,*
    484 U.S. 72 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Knight v. Iowa Dist. Court of Story County,*
    269 N.W.2d 430 (Iowa 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31-32

*Knowles v. City of Waco,*
    462 F.3d 430 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 50

*LLEH, Inc. v. Wichita County,*
    289 F.3d 358 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 27

*Martinez v. State,*
    163 S.W.3d 92 (Tex. App.—Amarillo 2005, no pet.) . . . . . . . . . . . . . . . 23

*McInnis-Misenor v. Maine Med. Ctr.,*
    319 F.3d 63 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*McIntyre v. Ohio Elections Comm'n,*
    514 U.S. 334 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Miller v. Tex. Tech Univ. Health Scis. Ctr.,*
    421 F.3d 342 (5th Cir. 2005) (en banc) . . . . . . . . . . . . . . 12, 16, 41, 48, 51

*Muir v. Alabama Educ. Television Comm'n,*
    688 F.2d 1033 (5th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*N.W. Enters. Inc. v. City of Houston,*
    352 F.3d 162 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*New York Times v. Sullivan,*
    376 U.S. 254 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*New York v. Ferber,*
    458 U.S. 747 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Oliver v. Scott,*
    276 F.3d 736 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*O'Neill v. Louisiana,*
    61 F. Supp. 2d 485 (E.D. La. 1998)
    *aff'd,* 197 F.3d 1169 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Palmer v. Waxahachie ISD,*
    2009 WL 2461889 (5th Cir. Aug. 13, 2009) . . . . . . . . . . 40, 41, 43, 44, 46

*People ex rel. Difanis v. Barr*,
    414 N.E.2d 731 (Ill. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 40

*Press-Enterprise Co. v. Superior Court*,
    464 U.S. 501 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Pruett v. Harris County Bail Bond Bd.*,
    499 F.3d 403 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

*Republican Party of Minn. v. Klobuchar*,
    381 F.3d 785 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37

*Rocky v. King*,
    900 F.2d 864 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Sandoval v. Bd. of Regents*,
    67 P.3d 902 (Nev. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Schirmer v. Edwards*,
    2 F.3d 117 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 49

*Soc'y. of Prof'l Journalists v. Sec'y of Labor*,
    616 F. Supp. 569 (D. Utah 1985),
    *vacated as moot*, 832 F.2d 1180 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . 36

*Sosna v. Iowa*,
    419 U.S. 393 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Spencer v. Kemna*,
    523 U.S. 1 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

x

*St. Cloud Newspapers, Inc. v. Dist. 742 Cmty. Schs.,*
    332 N.W.2d 1 (Minn. 1983) ................................. 29, 31

*Tennessean Newspapers, Inc. v. Fed. Hous. Admin.,*
    464 F.2d 657 (6th Cir. 1972) ................................. 35

*Tovar v. State,*
    978 S.W.2d 584 (Tex. Crim. App. 1998) ......................... 3

*Trenton v. New Jersey,*
    262 U.S. 182 (1923) ........................................ 17

*Turner Broad. Sys. v. FCC,*
    512 U.S. 622 (1994) ........................................ 43

*U.S. Parole Comm'n v. Geraghty,*
    445 U.S. 388 (1980) ........................................ 10

*United States v. Harriss,*
    347 U.S. 612 (1954) ................................... *passim*

*United States v. Inv. Enterprises, Inc.,*
    10 F.3d 263 (5th Cir. 1993) ................................. 24

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) ................................... *passim*

*Whiteland Woods, L.P. v. Township of West Whiteland,*
    193 F.3d 177 (3rd Cir. 1999) ............................... 36

*World Wide Street Preachers Fellowship v. Town of Columbia,*
    245 F. App'x 336 (5th Cir. 2007) ........................... 43

*Ysursa v. Pocatello Educ. Ass'n,*
    129 S. Ct. 1093 (2009) ..................................... 17

## Constitutional Provisions, Statutes and Rules

FED. R. APP. P. 43(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

FED. R. CIV. P. 15(a)(1)-(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

FED. R. CIV. P. 17(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

FED. R. CIV. P. 25(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

TEX. GOV'T CODE § 551.001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

TEX. GOV'T CODE § 551.001(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

TEX. GOV'T CODE § 551.002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

TEX. GOV'T CODE § 551.005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

TEX. GOV'T CODE § 551.041 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

TEX. GOV'T CODE § 551.043 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

TEX. GOV'T CODE § 551.128 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

TEX. GOV'T CODE § 551.143(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

TEX. GOV'T CODE § 551.144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 25

TEX. GOV'T CODE § 551.144(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 23, 24

TEX. PENAL CODE § 6.02(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Other Authorities**

Letter from James Madison to W. T. Barry,
    August 4, 1822, *in* 9 Writings of James Madison 103
    (G. Hunt ed. 1910) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Tex. Att'y Gen. Op. JC-307,
    2000 WL 1731174 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

TEX. DISCIPLINARY R. OF PROF'L CONDUCT 3.05(b) (1989) . . . . . . . . . . . . . . . . 54

No. 06-51587

# In the United States Court of Appeals for the Fifth Circuit

AVINASH RANGRA AND ANNA MONCLOVA,
*Plaintiffs-Appellants*,

v.

FRANK BROWN AND GREG ABBOTT,
*Defendants-Appellees.*

On Appeal from the United States District Court
Western District of Texas, Pecos Division

## SUPPLEMENTAL BRIEF OF APPELLEES

Numerous concessions about the deep and abiding importance of open meeting laws are sprinkled throughout Plaintiffs' brief—and for good reason. Open government is based on a fundamental premise: Elected officials work for the people.

At its core, the purpose of the First Amendment is to empower people to engage in a robust discourse about their government and the policies adopted on their behalf. Open meeting laws further, rather than frustrate, First Amendment values, by better informing the public about public business. Indeed, courts have invoked the First Amendment itself to require public access to certain government proceedings. The Constitution does not forbid what in many contexts it actually requires.

Perhaps it is because open meeting laws are so worthwhile—and constitutional as content-neutral, time place and manner regulations under *Ward v. Rock Against Racism*, 491 U.S. 781 (1989)—that Plaintiffs place an entirely different target within their sights. Rather than challenge open government directly, Plaintiffs attack a law that does not exist. They condemn strict criminal liability, and proclaim they should not be subject to prosecution for nothing more than the mere passive receipt of e-mail. But the Texas Open Meetings Act applies only to "knowing" "participation" in secret meetings—not inadvertent behavior, and certainly not the passive receipt of e-mails.

What's more, Plaintiffs attack a law they admit no longer applies to them. The entire premise of Plaintiffs' standing before the panel was Avinash Rangra's service on the Alpine City Council. Because he has left the council (and because in any event he attacks a law that does not exist), the dispute is now hypothetical and thus moot.

To avoid this problem, opposing counsel launches an eleventh-hour attempt to substitute new parties as Plaintiffs, based on their new theory that Plaintiffs filed this suit in their official capacity. But this tactic is not only tardy (under their view, Monclova has not been a Plaintiff since May 2006). It is premised on a dubious notion—that Plaintiffs brought suit to protect not their own rights, but the First Amendment rights of the governmental body on which they once served. But if an

2

official violates TOMA, the governmental body does not suffer the penalty. Nor does his successor. Accordingly, Plaintiffs' appeal should be dismissed as moot.

That is unfortunate, for the State is eager to defend the Act and the cause of open government. Both the Texas Supreme Court and the Texas Court of Criminal Appeals have repeatedly enforced TOMA. *See, e.g., Acker v. Tex. Water Comm'n*, 790 S.W.2d 299, 300 (Tex. 1990) ("Our citizens are entitled to more than a result. They are entitled not only to know what government decides but to observe how and why every decision is reached."); *Tovar v. State*, 978 S.W.2d 584, 587 (Tex. Crim. App. 1998) (purpose of TOMA is to "safeguard[] the public's interest in knowing the workings of its governmental bodies"). And a Texas court of appeals has upheld it against First Amendment challenge. *See Hays County Water Planning P'ship v. Hays County*, 41 S.W.3d 174, 181-82 (Tex. App.—Austin 2001, pet. denied).

The State welcomes the opportunity to persuade this Court to do the same. Every State has enacted an open meeting law, and every court to have confronted a First Amendment challenge to such laws has upheld them. As one court explained:

> Elected officials are supposed to represent their constituents. In order for those constituents to determine whether this is in fact the case they need to know how their representative has acted on matters of public concern. Democracy is threatened when public decisions are made in private. Elected officials have no constitutional right to conduct governmental affairs behind closed doors. Their duty is to inform the electorate, not hide from it.

*Kansas ex rel. Murray v. Palmgren*, 646 P.2d 1091, 1099 (Kan. 1982).

## STATEMENT OF JURISDICTION

As discussed below, Plaintiffs have lost their standing to pursue this appeal. Accordingly, their appeal should be dismissed as moot. *See infra* at 8-27.

## STATEMENT OF FACTS

Like virtually every open meeting law across the country, *see infra* at 29-33, the Texas Open Meetings Act is based on a simple premise: Because the decisions of governmental bodies are made not on behalf of the members themselves, but on behalf of the people they serve, the people have a right to view the decisionmaking process. Accordingly, TOMA provides that members of governmental bodies may not meet, either formally or informally, to discuss public business within their jurisdiction with a quorum of their colleagues, unless the body provides advance notice to the public about the meeting and the opportunity to attend. *See* TEX. GOV'T CODE §§ 551.001, 551.002, 551.041, 551.043, 551.144.

Plaintiffs are seeking prospective relief only—a declaration that the criminal provision of TOMA (§ 551.144) is unconstitutional and an injunction forbidding enforcement of that provision. Accordingly, the facts surrounding the October 21-22, 2004 e-mails are not relevant to this case, even if they motivated the original initiation of this lawsuit by Plaintiffs Rangra and Monclova.

4

The State does wish to clarify one point from Plaintiffs' statement of facts: The dismissed indictments arising from the October 21-22, 2004 e-mails were based *solely* on the sending (and not on the passive receipt) of e-mails about public business with a quorum of the Alpine City Council. *See infra* at 25. Plaintiffs insinuate that the dismissed indictments were brought for purely political reasons, because they targeted the only two city council members (Elms-Lawrence and Rangra) who were up for immediate reelection, yet did not target the two other city council members (Monclova and Payne) who were also on the e-mails but were not up for reelection at that time. Pltfs' En Banc Br. at 6.

The motivations that lead to one particular enforcement action under a statute bear no relevance, of course, to whether or not the statute itself is facially constitutional. After all, the conduct of a single prosecutor cannot provide the basis for invalidating an enactment of the Legislature. Moreover, the record of this case shows that only Elms-Lawrence and Rangra sent e-mails about public business to a quorum of their colleagues. Monclova and Payne were merely copied on those e-mails, and mere passive receipt of e-mails is not a violation of TOMA, as discussed below. *See infra* at 22-27.

5

## SUMMARY OF ARGUMENT

1.    Plaintiffs have lost standing to pursue this appeal. Plaintiffs seek only prospective relief, and they admit that neither Rangra nor Monclova are governed by TOMA any longer now that both have departed the Alpine City Council. Opposing counsel attempts to revive Plaintiffs' standing to pursue this appeal by substituting new parties in this case. They justify the substitution by claiming that Plaintiffs have always sued in their official, rather than personal, capacity. But this is an entirely new contention, raised for the first time at this late stage in the litigation. And the claim is based in any event on the suspect notion that Rangra and Monclova sued not to vindicate their own First Amendment rights, but rather the First Amendment rights of the City of Alpine.

Accordingly, this appeal is moot. Plaintiffs invoke the doctrine of "capable of repetition yet evading review" in an attempt to avoid mootness. But they cannot demonstrate, as they must, that the legal injury they claim to suffer under TOMA is "always so short" in duration as to evade review.

Moreover, Plaintiffs lack standing for an additional reason: They are attacking a law that does not exist, and that the Legislature has not enacted. TOMA is not a strict liability statute, and it does not forbid the mere passive receipt of e-mail. To the

6

contrary, TOMA expressly requires knowing participation in a closed meeting. The dispute Plaintiffs present on rehearing en banc is thus entirely hypothetical.

2.    Nothing is lost by dismissing this appeal as moot, because TOMA is entirely constitutional. Indeed, Plaintiffs repeatedly insist that they are not attacking open government, and are not defending the conduct of public business behind closed doors. After all, every state in the nation has enacted an open meeting law; every court to have confronted a First Amendment challenge to such a law has rejected the challenge and upheld the law; and indeed, numerous courts have construed the First Amendment *itself* to require public access to a variety of governmental proceedings.

This nationwide legislative and judicial consensus in support of open government is understandable on several levels. Requiring government officials to conduct public business in public furthers, rather than frustrates, fundamental First Amendment values. And open meeting laws satisfy traditional First Amendment analysis. They are content-neutral, reasonable time, place, and manner regulations under *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). They satisfy strict scrutiny under the plurality decision in *Burson v. Freeman*, 504 U.S. 191 (1992), in any event. And there is nothing atypical about the Texas law that justifies a different result.

7

## ARGUMENT

## I. PLAINTIFFS HAVE LOST STANDING TO PURSUE THIS APPEAL BECAUSE THE DISPUTE IS NOW ENTIRELY HYPOTHETICAL—TOMA NO LONGER APPLIES TO THEM, AND IT DOES NOT FORBID WHAT THEY CLAIM IT FORBIDS.

The State is eager to defend TOMA on the merits, and to contest the alarming

proposition that every state and federal open meeting law in the nation is somehow

presumptively invalid (when in fact, such laws are reasonable, content-neutral time,

place, or manner regulations).  Unfortunately, Plaintiffs' case no longer presents the

State with a real opportunity—and a justiciable controversy—in which to do so.

To begin with, Plaintiffs lack standing because it is undisputed that TOMA no

longer applies to either Rangra or Monclova (the only two Plaintiffs in this case).  In

hopes of avoiding this problem, opposing counsel has now suddenly announced that

Rangra and Monclova are not Plaintiffs in this case after all—indeed, Monclova has

not been a Plaintiff for well over three years.  They ask that their successors in office

be substituted as Plaintiffs, based on the theory that Rangra and Monclova filed this

suit in their official rather than personal capacity.

This tactic is tardy—and meritless in any event.  Plaintiffs' new theory is based

on a dubious premise—that Rangra and Monclova sued not to protect their own,

personal rights, but the First Amendment rights of the governmental body they once

served.  That defies common sense.  After all, if an official commits an offense under

8

TOMA, it is that official who suffers the consequences—not the governmental body, and not his or her successor in office.

There is an additional problem with Plaintiffs' standing in this case: They are now attacking a law that does not exist. As its plain text make clear, TOMA does not criminalize the passive receipt of e-mail, as Plaintiffs claim. Nor is it a strict criminal liability statute. In essence, then, Plaintiffs are asking the State to defend a law the Legislature has never enacted. That makes this case a purely hypothetical dispute—Plaintiffs are essentially seeking an advisory opinion from the Court, addressing what would happen *if* the State were to enact legislation forbidding the passive receipt of e-mails concerning public business by elected officials.

A party does not have standing to challenge a law that does not apply to them—and does not forbid any conduct in which they wish to engage in any event. A plaintiff has standing to litigate actual—and not hypothetical—controversies. *See, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("an injury in fact [is] an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual and imminent, *not conjectural or hypothetical*") (quotations omitted, emphasis added); *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (to establish standing to challenge a criminal statute, plaintiff must "allege[] an intention to engage in a course of conduct arguably affected with a constitutional

9

interest, *but proscribed by a statute*, and there exists a credible threat of prosecution thereunder") (emphasis added).  Moreover, a plaintiff's standing to sue must exist, not only at the time the suit is initially filed, but throughout the pendency of the litigation—or else the litigation is moot.  *See, e.g., U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (mootness is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness)") (citation omitted).

Plaintiffs' dispute with TOMA is now entirely hypothetical.  Accordingly, the appeal should be dismissed as moot.

### A.    Plaintiffs Have Lost Their Standing To Pursue This Appeal Because TOMA Indisputably No Longer Applies To Rangra And Monclova.

Only a "member of a governmental body" covered by TOMA can commit a crime under the Act—an ordinary citizen cannot.  TEX. GOV'T CODE § 551.144(a). Neither Rangra nor Monclova still serve on a governmental body covered by the Act. Monclova vacated her seat on the Alpine City Council in May 2006, while Rangra left the city council in May 2009.  Accordingly, TOMA no longer applies to either—and thus, neither has standing to pursue this appeal.

It is not enough that Plaintiffs were *once* subject to TOMA (and they do not claim otherwise).  It is dispositive that Plaintiffs are no longer on the council and thus no longer subject to criminal prosecution under the Act.  *See, e.g., Arizonans for*

10

*Official English v. Arizona*, 520 U.S. 43, 67 (1997) (dismissing case as moot where, because plaintiff "left her state job . . . to take up employment in the private sector, where her speech was not governed by" the law she challenged as unconstitutional, "it became plain that she lacked a still vital claim for prospective relief").

Nor is it enough that Rangra may run for public office in the future (notably, he does not mention which office, let alone whether that office is subject to TOMA). *See id.*; *O'Neill v. Louisiana*, 61 F. Supp. 2d 485, 489-91 (E.D. La. 1998) (no standing where plaintiff alleged that he had the "express intention to seek other elective offices in the future" but that a law governing elected officials "chills his right to run for these offices"), *aff'd*, 197 F.3d 1169, 1170 (5th Cir. 1999) (affirming for "essentially the reasons set forth in the complete and well-crafted opinion of [the district] court"). Accordingly, Plaintiffs' appeal is now moot.

**B.     Plaintiffs' Attempt To Manufacture Standing By Substituting New Parties In Place Of Rangra And Monclova Is Untimely—And In Any Event Based On The Dubious Notion That TOMA Impacts Not Plaintiffs' Own First Amendment Rights, But Those Of The City.**

Although they admit that TOMA no longer applies to Rangra or Monclova, Plaintiffs do not concede that this moots their appeal. To the contrary, Plaintiffs have engineered an entirely new theory of standing at the eleventh hour: official capacity. Under their confounding new theory, Rangra and Monclova are no longer Plaintiffs in this case—indeed, Monclova has not been a Plaintiff for over three years. Instead,

11

they say their successors in office have taken over the litigation, because Plaintiffs originally sued in their official capacity. The announcement of Plaintiffs' new theory of standing comes remarkably late in the litigation—and it suffers from a number of defects in any event.

When the State first learned that Rangra had left the city council, the State immediately informed the Court and the parties on August 10, 2009. After all, Rangra's service on the city council provided the *only* basis for standing identified by the panel in its April 2009 decision. *See* slip op. at 3 n.2. Plaintiffs never claimed they were suing in their official capacity; never claimed Monclova was no longer a party to the case as of May 2006; and never claimed her successor in office had standing. *See, e.g., Miller v. Tex. Tech Univ. Health Scis. Ctr.*, 421 F.3d 342, 349 (5th Cir. 2005) (en banc) ("The maxim is well established in this circuit that a party who fails to make an argument before either the district court or the original panel waives it for purposes of en banc consideration.").

But now that both Plaintiffs no longer have standing to challenge TOMA, opposing counsel has switched gears and announced a new theory of standing. They now claim Plaintiffs have been suing all along in their official capacity.

To support this newfound theory of standing, Plaintiffs have now provided the Court with a complete (if belated) history of recent city council membership in the

12

City of Alpine, backed up with freshly minted affidavits (some affidavits are undated, but given the context, they all appear to be of recent vintage). As Plaintiffs now explain: Monclova once represented Ward 2 on the city council. But she vacated her seat in May 2006. She was succeeded by Annabel Holguin, who served until May 2008. Johanna Nelson now represents Ward 2. The other original Plaintiff, Rangra, represented Ward 1 on the city council until May 2009, when he left office due to term limits. He was succeeded by Angie Bermudez.

Plaintiffs' new approach to standing leads to some surprising results—starting with the fact that, contrary to everyone's previous understanding of the case, Monclova has not been a Plaintiff since May 2006. Nor is Rangra a Plaintiff today. Instead, opposing counsel has just introduced two entirely new players to the case—Bermudez and Nelson, who now hold the city council seats Rangra and Monclova once held, and who are apparently now the Plaintiffs in this case. They have also introduced Holguin to their narrative for the first time. Holguin was apparently a Plaintiff between May 2006 and May 2008—and thus must have been a Plaintiff (instead of Monclova) when the district court issued its November 2006 ruling, as well as when a panel of this Court heard oral argument (but not when the panel issued its April 2009 ruling, because Nelson took over the seat in May 2008).

Yet as far as the State can tell, Plaintiffs did not once mention either Holguin or Nelson (Monclova's two successors in office) to the panel, despite the fact that standing was a live and contested issue at that time.

Plaintiffs' tactic is clever—and if valid, it would provide the parties with the opportunity they all seek to litigate the validity of TOMA. But the tactic raises more questions than it answers.

Untimeliness. To begin with, there is a substantial question of timeliness. This appears to be the first time Plaintiffs have ever suggested they are suing in their official capacity. That they waited until months after Rangra left the city council (and only after the State first uncovered this fact and disclosed it to the Court) to articulate this theory suggests it is too late in the day for Plaintiffs to amend their pleadings. *See, e.g.*, FED. R. CIV. P. 15(a)(1)-(2) (permitting plaintiffs to amend complaint once within 20 days after service, and otherwise requiring consent of the parties or leave of court). Indeed, Plaintiffs ironically waited until after they left office before ever asserting that they were suing in their official capacity.

The record below further indicates that Plaintiffs are untimely. Plaintiffs have pointed to nothing in their trial court pleadings to suggest they were indeed suing in their official capacity at the outset of this case. And nothing in their complaint expressed that they were doing so.

14

To the contrary, their complaint specifically refrained from joining Elms-Lawrence as a Plaintiff—even though she and Rangra were the only members actually indicted at one time. The reason Plaintiffs provide for omitting Elms-Lawrence from their complaint is telling. It is not because she was unwilling to join the case. Rather, "Elms-Lawrence . . . is not a plaintiff, as she is no longer a member of the Alpine City Council." Complaint ¶ 8.

The caption of the complaint is also instructive. Defendants Brown and Abbott are sued in their capacities as "83d Judicial District Attorney" and "Texas Attorney General," respectively. But with respect to Plaintiffs, by contrast, the captions do not even mention their official status as members of the Alpine City Council—let alone indicate that they are suing in their official capacity. That omission is telling. After all, if they were indeed suing on behalf of the City of Alpine, Plaintiffs should have indicated that fact somehow in the complaint. *See, e.g.*, FED. R. CIV. P. 17(a)(1) ("An action must be prosecuted in the name of the real party in interest.").

The complaint caption also presents an additional irony in Plaintiffs' eleventh hour effort to switch parties: Plaintiffs previously *opposed*—and this Court accordingly denied—a motion by Defendant Brown to substitute the newly elected 83d Judicial District Attorney, even though their own complaint actually mentioned Brown's official title, without doing the same for either Rangra or Monclova.

15

One could charitably construe this suit as a putative class action, brought not only on behalf of Rangra and Monclova but also "all others similarly situated." Complaint ¶ 3. Had Plaintiffs moved to certify a plaintiff class accordingly, perhaps it might be possible to substitute new class representatives today, now that both Rangra and Monclova have lost their standing and thus their legal adequacy as class representatives. *See, e.g., Rocky v. King*, 900 F.2d 864, 867 (5th Cir. 1990) ("[If] the named plaintiff's individual claim [becomes] moot after proper certification of a class, the class action [is] not rendered moot.") (*citing Sosna v. Iowa*, 419 U.S. 393, 398-403 (1975)). But Plaintiffs did not do so. Accordingly, Plaintiffs' new approach to standing faces serious timeliness issues. *See, e.g., Miller*, 421 F.3d at 349 (5th Cir. 2005) (arguments not made prior to en banc rehearing are waived).

<u>Merits</u>.  Timeliness problems aside, Plaintiffs' tactic is also substantively questionable.  They claim Rangra and Monclova brought this suit in their official rather than personal capacities, and thus invoke Rule 43 of the Federal Rules of Appellate Procedure to substitute their successors as Plaintiffs accordingly.  But in doing so, Plaintiffs are necessarily hypothesizing, in essence, that Rangra and Monclova brought this suit not to vindicate their own rights, but to protect the First Amendment rights of the government they once served. *See, e.g., Karcher v. May*, 484 U.S. 72, 78 (1987) ("We have repeatedly recognized that the real party in interest

in an official-capacity suit is the entity represented and not the individual officeholder."); FED. R. CIV. P. 25(d) Advisory Committee note (official capacity suits are "brought by public officers for the government"); FED. R. APP. P. 43(c) Advisory Committee note (FRAP 43(c) is modeled on FRCP 25(d)).

Plaintiffs' argument is dubious on several levels. To begin with, the First Amendment rights Plaintiffs assert in this case are plainly those of Rangra and Monclova personally. Plaintiffs have never contended they brought suit against the State to protect the First Amendment rights of the City of Alpine—nor have they ever explained how they could do so even if they had meant to. *Cf. Muir v. Alabama Educ. Television Comm'n*, 688 F.2d 1033, 1038 (5th Cir. 1982) ("[G]overnment is not restrained by the First Amendment from controlling its own expression . . . . [T]he purpose of the First Amendment is to protect private expression and nothing in the guarantee precludes the government from controlling its own expression or that of its agents.") (quotations omitted); *Ysursa v. Pocatello Educ. Ass'n*, 129 S. Ct. 1093, 1100 (2009) ("[Cities] are 'merely . . . department[s] of the State, and the State may withhold, grant, or withdraw powers and privileges as it sees fit.'") (*quoting Trenton v. New Jersey*, 262 U.S. 182, 187 (1923)).

Moreover, there is good reason why Plaintiffs have consistently framed their theory of liability on the constitutional rights of officeholders—not municipalities.

17

After all, if an elected official commits an offense under TOMA, it is that official who suffers the penalties—not the governmental body on which the official serves, and certainly not the person who succeeds the official in office. Neither the governmental body, nor the successor in office, pays any fine or serves any term of imprisonment.

At bottom, Plaintiffs seem to confuse standing with capacity. Rangra and Monclova may have once had *standing* to sue, based on the fact that they were officials covered by TOMA. But that does not mean they were suing on behalf of the government itself, in their official capacity.

There is at least one more potential problem with Plaintiffs' new standing theory. To the extent Rangra and Monclova ever possessed official authority to do *anything*, it was in their capacity as members of the Alpine City Council. And like any typical governmental body, the city council can act only through the approval of its members. Yet Plaintiffs do not allege that the city council ever approved their lawsuit back in 2005 as an official action on behalf of the City of Alpine.

In light of the various problems that plague this last-minute maneuvering on standing, it is unsurprising that Plaintiffs seem half-hearted in the effort. Plaintiffs not only continue to refer to Rangra as "Appellant"—they continue to press his own standing to sue, based on his future plans to run for office. Yet Plaintiffs would be barred from even presenting this argument were this a *bona fide* official capacity

suit—because in that event, Rangra would no longer be a Plaintiff in the first place. Of course, Rangra's future plans to pursue office presents a textbook example of a hypothetical injury insufficient to confer standing, as previously noted. The only point here is that, in order to press Rangra's own basis for standing in the first place, opposing counsel must first acknowledge that Rangra and Monclova (and not Bermudez or Nelson) remain the true Plaintiffs in this case. And because that must be so, the only true Plaintiffs in this case now lack standing to pursue this appeal.

C.    **Because Plaintiffs Have Lost Standing To Pursue Their Claims, The Court Should Dismiss The Appeal As Moot.**

Now that Plaintiffs have lost their standing, the appeal must be dismissed as moot. Plaintiffs counter that the case is not moot because the underlying dispute is "capable of repetition yet evading review." Unlike Plaintiffs' other standing arguments, this one does appear in their complaint. Complaint ¶ 17. But it does not save Plaintiffs' case. This exception to mootness applies "only in *exceptional situations*." *Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (emphasis added, quotations omitted). Two conditions must be "simultaneously present: (1) the challenged action [is] in its duration *too short* to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *Id.* at 17 (emphasis added).

The first condition of the doctrine is especially devastating to Plaintiffs. It is not enough that a party in a particular case might not have sufficient time to fully litigate the issues. Instead, a plaintiff must show that the kind of injury they allege is so inherently limited in duration that it is "always" destined to become moot before litigation can be completed. *See, e.g., id.* at 18 ("[Plaintiff] has not shown (and we doubt that he could) that the time between parole revocation and expiration of sentence is *always so short* as to evade review.") (emphasis added); *Bowler v. Ashcroft*, 46 F. App'x 731 (5th Cir. 2002) ("Bowler has not shown that the time between judicial review of the BOP's calculation of good-time credits and expiration of a sentence is *always so short* as to evade review") (emphasis added). *See also McInnis-Misenor v. Maine Med. Ctr.*, 319 F.3d 63, 69 n.3 (1st Cir. 2003) ("Because some injuries occur and are over so quickly that they will *always* be moot before federal litigation is complete, such injuries are deemed an exception to the ordinary mootness doctrine.") (emphasis added).

Plaintiffs' challenge to TOMA plainly fails this condition, because they cannot prove, as they must, that the alleged injury inflicted by TOMA on covered officials is "*always* so short" in duration that it cannot "be fully litigated." *Kemna*, 523 U.S. at 17-18 (emphasis added). Far from it, in fact: TOMA applies continuously to all covered officials for so long as they shall serve in office. Indeed, consider this very

20

case: Nearly four years have elapsed since the initiation of this suit until Rangra left office. Throughout this time, Plaintiffs have had standing to pursue this case, because TOMA has applied to Rangra for the entire duration. Four years of litigation is far from "always" being "too short" a period of time for the case "to be fully litigated prior to cessation or expiration" of the dispute. Indeed, if four years were not enough, then virtually no case would ever be moot—practically *every* case would be subject to this doctrine. Other officials might easily serve for even longer than four years. Plaintiffs thus cannot show that the alleged injury under TOMA is *always* "too short to be fully litigated prior to cessation or expiration."

Plaintiffs will also have trouble satisfying the second prong of this doctrine, because they cannot show a "demonstrated probability" or "reasonable expectation" that the same controversy involving the same plaintiffs will recur. *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002). Monclova alleges no desire to hold office in the future, while Rangra has not alleged that he intends to pursue an office actually governed by TOMA, let alone that he will win it.

At bottom, this case is (for purposes of mootness analysis, at least) a garden variety dispute—and not an "exceptional situation" justifying invocation of the doctrine of "capable of repetition yet evading review."

21

**D.    This Case Is Moot For An Additional Reason:  Plaintiffs Are Now Essentially Seeking An Advisory Opinion To Resolve A Purely Hypothetical Dispute—TOMA Forbids Only Knowing Participation In A Closed Meeting, Not The Passive Receipt Of E-mails.**

Plaintiffs' appeal suffers from an additional jurisdictional defect.  They are essentially seeking an advisory opinion, because they are asking the Court to resolve a hypothetical question.  Plaintiffs have scaled back the ambition of their case on rehearing en banc.  And what is now left of their case is a purely hypothetical dispute—alleging injury from a law that does not exist.

Specifically, Plaintiffs have manufactured this entire dispute by alleging, incorrectly, (1) that TOMA is a "strict criminal liability statute," and (2) that the Act criminalizes "the passive receipt of e-mail by public officials."  Pltfs' En Banc Br. at 7-8.  *See also id.* at 14-16, 17, 20-21.  These twin assertions constitute virtually the entire foundation of Plaintiffs' complaint about TOMA on rehearing en banc.

Yet both claims are a demonstrably false and mistaken reading of TOMA—as the plain text of the Act makes readily apparent:

(a)    A member of a governmental body commits an offense if a closed meeting is not permitted under this chapter and the member *knowingly*:

    (1)    *calls or aids in calling or organizing* the closed meeting, whether it is a special or called closed meeting;

    (2)    *closes or aids in closing* the meeting to the public, if it is a regular meeting; or

    (3)    *participates* in the closed meeting, whether it is a regular, special, or called meeting.

TEX. GOV'T CODE § 551.144(a) (emphasis added).

As its plain text makes clear, the Act is not a strict liability statute. Quite the opposite, it criminalizes only "knowing[]" conduct. *Id. See also Aguirre v. State*, 22 S.W.3d 463, 471 (Tex. Crim. App. 1999) ("a statute is not to be treated as a strict liability statute unless . . . the definition of the offense plainly dispenses with any mental element") (quotations omitted); TEX. PENAL CODE § 6.02(d) (establishing "knowing" conduct as one of the "highest" degrees of "culpable mental states").

Nor does TOMA prohibit the passive receipt of e-mail. To the contrary, a covered official violates TOMA only if he or she "knowingly" engages in one of the activities enumerated in the statute—namely, if he or she knowingly "calls or aids in calling or organizing" a closed meeting, "closes or aids in closing" a meeting, or "participates in the closed meeting." TEX. GOV'T CODE § 551.144(a). Perhaps Plaintiffs construe the term "participate[]" to somehow include the passive receipt of e-mail. But they never say so, or cite any case law that says so. *Cf. Martinez v. State*, 163 S.W.3d 92, 94 (Tex. App.—Amarillo 2005, no pet.) (for purposes of establishing accomplice liability, "participation requires the performance of an affirmative act to promote [the] commission [of a crime]").

23

Tellingly, Plaintiffs do not bother to square their allegations about the meaning of TOMA with the text of § 551.144(a). Their only remotely textual claim appears when they take note of a neighboring provision, § 551.143(a), which establishes the separate crime of conspiracy to circumvent TOMA. Pltfs' En Banc Br. at 8, 17. It is true—and of no moment—that conspiracy under TOMA includes not only a knowingness element (as in § 551.144(a)) but also specific intent to commit the underlying substantive offense. That is entirely typical of conspiracy statutes—and it is entirely unclear how or why Plaintiffs think this insight helps their cause.[1]

To bolster their anti-textual reading of TOMA, Plaintiffs resort to mischaracterizing the positions taken by both the State and the district court in the proceedings below. Specifically, Plaintiffs claim that both the State and the court

---

[1]     Perhaps Plaintiffs would prefer, as a policy matter, that prosecutions under § 551.144(a) be limited to cases involving not only knowledge, but also specific intent to commit a crime. But Plaintiffs do not articulate this preference as legal argument, and for good reason: Ignorance of the law is no excuse—and the First Amendment provides no exception. *See, e.g.*, *Hamling v. United States*, 418 U.S. 87, 123 (1974) (rejecting argument that the First Amendment "permit[s] the defendant to avoid prosecution [under federal obscenity law] by simply claiming that he had not brushed up on the law"); *United States v. Inv. Enterprises, Inc.*, 10 F.3d 263, 267-68 n.5 (5th Cir. 1993) (same).

Moreover, it was, of course, entirely reasonable for the Legislature to draft § 551.144(a) to require knowledge but not specific intent to commit a crime. After all, to adopt Plaintiffs' contrary approach would all but gut TOMA—because it would prevent the Act from being applied to the vast majority of state and local elected officials who do not routinely demonstrate criminal intent. The Legislature separately addressed any policy concerns Plaintiffs might have when it required open meetings training for every state and local official in Texas who is covered by the Act. *See* TEX. GOV'T CODE § 551.005.

below concluded that TOMA somehow prohibits the passive receipt of e-mail, notwithstanding its text. Pltfs' En Banc Br. at 4, 7, 8.

But the record of this case demonstrates the opposite. Both the State and the trial court considered only actual, knowing communications—and not the passive receipt of e-mail—to be prohibited by the Act. *See, e.g.*, Conclusion of Law ¶ 13 ("[U]nder section 551.144, a member must 'knowingly' participate in a closed meeting") (citing Tex. Att'y Gen. Op. JC-307, 2000 WL 1731174, *7).

Passive recipients of e-mails do not violate TOMA and were never at risk of prosecution. RR.44. The dismissed indictments pertained only to the two city council members (Elms-Lawrence and Rangra) who actually wrote and sent secret e-mails about public business to a quorum of their colleagues. They did *not* target the two members who merely received those e-mails (Monclova and Payne).

For their part, Plaintiffs' entire argument seems to rest on certain statements in the opinion and briefing below they say support their interpretation. Yet Plaintiffs have not identified a single statement that actually concludes that passive receipt of e-mail violates TOMA. Plaintiffs instead focus almost all their attention on a single sentence from the State's briefing in the court below, which states that "the plaintiffs' conduct . . . violated the Open Meetings Act." Pltfs' En Banc Br. at 4, 7, 8. Plaintiffs attempt to impute unintended meaning to this generic statement. Unintended

25

meaning, drawn from a single stray reference, is a wholly inadequate foundation on which to build a justiciable dispute over a perfectly unambiguous statute.

Plaintiffs also mischaracterize the TOMA training video submitted into evidence at trial. Pltfs' En Banc Br. at 15-16. Plaintiffs seem to suggest that, according to the video, a person commits a crime under TOMA "where a fellow board member *unexpectedly* speaks out" and thereby initiates a closed meeting in violation of the Act. *Id.* at 16 (emphasis added). But the video says no such thing. And any such statement would contradict the plain text of TOMA. The Act expressly states that only "knowing" participants in a closed meeting violate TOMA. If a member of a governmental body does not know that one of his or her colleagues plans to initiate a closed meeting in violation of TOMA, the mere fact of that member's attendance at that meeting is not sufficient to constitute "knowing" participation in a closed meeting. Only the knowing participant violates TOMA.

Plaintiffs' strained efforts notwithstanding, TOMA does not criminalize what Plaintiffs now say it does. As a result, this dispute is entirely hypothetical. What they are now seeking on rehearing en banc is nothing more than an advisory opinion. They are essentially asking the Court to decide what would happen *if* the State tried to enact legislation forbidding the passive receipt of e-mails concerning public

business by elected officials. No such legislation has been introduced, let alone approved by both Houses of the Legislature and signed by the Governor.

Plaintiffs' complaint thus presents the classic hypothetical dispute in pursuit of an advisory opinion. *See, e.g., Lujan*, 504 U.S. at 560 (no standing if the alleged injury is merely "conjectural or hypothetical" rather than "actual and imminent"); *Babbitt*, 442 U.S. at 298 (no standing to challenge criminal statute if plaintiff does not allege "an intention to engage in a course of conduct" that is "proscribed by a statute"); *cf. Republican Party of Minn. v. Klobuchar*, 381 F.3d 785, 792-93 (8th Cir. 2004) (denying standing because, "although the Party has alleged an intention . . . to engage in a course of conduct arguably affected with a constitutional interest, such course of conduct . . . is not proscribed by [the challenged statute]").

For these reasons, Plaintiffs' appeal should be dismissed as moot.

## II.    PLAINTIFFS CANNOT—AND APPEAR NOT TO—CHALLENGE WHAT TOMA ACTUALLY DOES, BECAUSE IT IS A REASONABLE, CONTENT-NEUTRAL TIME PLACE OR MANNER REGULATION THAT FURTHERS OPEN GOVERNMENT.

The foundation of this appeal is not just fatally flawed, but oddly so: Not only do Plaintiffs criticize TOMA for what it does not do—they also appear to agree that the State may indeed forbid all that TOMA restricts. As a result, not only is there nothing left in this case for the Court to adjudicate—nothing is put at risk by dismissing the appeal as moot. The Act is a reasonable, content-neutral time, place

27

or manner regulation—consistent with established Supreme Court precedent, the enactment of open meeting laws by every other state as well as the federal government, and numerous judicial opinions nationwide.

A. **The Court Need Not Address The Constitutional Standard That Applies To Open Meeting Laws, Because Plaintiffs Have Conceded That States May Forbid Governmental Bodies From "Conducting Public Business Behind Closed Doors."**

In their en banc brief, Plaintiffs expressly disclaim any attempt to "strike down the entire Open Meetings Act." Pltfs' En Banc Br. at 7. They repeatedly concede that "there certainly is a compelling government interest in open government." *Id.* at 8. *See also id.* at 10, 16 (same). They say "[i]t is undisputed that open government demands that decisions be made in the open, and that the public has full opportunity to know what is decided and the reasons behind it." *Id.* at 36. And to remove all doubt, Plaintiffs "in no way endorse governing bodies conducting public business behind closed doors." *Id.* at 7.

As noted, Plaintiffs' criticisms are reserved exclusively for a law that does not exist—and no longer applies to them in any event. Whether these defects undermine Plaintiffs' claims on their merits, or deprive the Court of jurisdiction to hear this appeal in the first place, the result is the same. The Court need not determine the appropriate constitutional standard to apply to open meeting laws generally, or TOMA specifically, because Plaintiffs do not challenge what TOMA actually does.

**B.    Every Legislature In The Nation Has Enacted—And Courts Across The Country Have Consistently Upheld—Open Meeting Laws Under The First Amendment.**

Whether strategic or sincere, Plaintiffs' unwillingness to criticize the general principle of open government—and the specific value of open meetings—is unsurprising. After all, open meeting laws are ubiquitous—as are the court rulings affirming their constitutionality.

Every state in the nation, as well as the federal government, has enacted open meeting laws. *See, e.g., St. Cloud Newspapers, Inc. v. Dist. 742 Cmty. Schs.*, 332 N.W.2d 1, 5, 7 (Minn. 1983) ("The belief that the public is entitled to greater access to meetings of government bodies has inspired all 50 states to pass statutes that require certain public agencies to conduct all official meetings in sessions open to the public."). *See also* App. (listing the open meeting laws of all 50 States).[2]

TOMA is entirely typical of this body of law (notwithstanding Plaintiffs' insinuations to the contrary). Every open meeting law requires covered governmental bodies to conduct certain meetings in the open. Every open meeting law applies only when a quorum of members has gathered—and only when the discussion involves

---

2.    The State will file an appendix containing a chart of every open meeting law in the nation. The State anticipates that this chart will identify the key features of each law and support the summary of various open meeting laws provided in this brief. *See infra* at 29-33. The chart will be filed with the Court on or before the September 9, 2009 deadline for the filing of Defendants' en banc supplemental brief. (The State has filed this brief, without the appendix, on an expedited basis in order to meet the Court's August 28, 2009 deadline to receive briefing on mootness.)

public business within their jurisdiction (although some laws apply only where deliberation is accompanied by an actual decision, whereas other laws, like Texas, apply to discussions about public business even in the absence of a formal decision). And every open meeting law requires advance notice to the public when such a meeting will take place—although the specific nature of the required notice (such as the number of days and the manner of such notice) may vary.

In addition, every open meeting law imposes consequences for noncompliance—and although, again, jurisdictions do vary with respect to the nature and extent of the penalty, the extent of the penalties are all well within reason, with no jurisdiction longer than one year of jail time for knowing violations of the law. Moreover, although Texas law imposes no penalty absent knowing conduct, some states are more restrictive, imposing liability for a negligent open meeting violation or even strict liability.

Finally, many open meeting laws, as in Texas, have been construed to apply specifically to electronic as well as physical, in-person discussions (while many other open meeting laws have yet to be construed one way or another in this context). *See also* TEX. GOV'T CODE § 551.128 (authorizing Internet broadcasts of open meetings).[3]

---

3.      Also like virtually every open meeting law, TOMA does not apply to all governmental bodies—but only those expressly enumerated by statute. *See* TEX. GOV'T CODE § 551.001(3). It would not apply, for example, to governmental bodies that do not exercise any actual governmental authority, such as advisory boards and committees. *See id.*

Given the ubiquity of such laws, it is unsurprising that *every* court to our knowledge to have addressed the validity of state and federal open meeting laws under the First Amendment has upheld them. The D.C. Circuit has upheld a federal open meeting law against First Amendment attack. *See Center for Auto Safety v. Cox*, 580 F.2d 689, 694 (D.C. Cir. 1978). Likewise, state supreme courts in Illinois, Colorado, Kansas, Nevada, Minnesota, and Tennessee have upheld their states' respective open meeting laws. *See, e.g., People ex rel. Difanis v. Barr*, 414 N.E.2d 731, 739 (Ill. 1980) ("It is a well recognized constitutional principle that the government may adopt reasonable time, place and manner regulations which do not discriminate among speakers or ideas, in order to further an important governmental interest unrelated to the restriction of communication. . . . The Open Meetings Act does not prohibit political discussions between or among members of public bodies; thus there is no chilling effect upon political discussion.") (citations omitted); *Cole v. Colorado*, 673 P.2d 345, 350 (Colo. 1983) (same); *Palmgren*, 646 P.2d at 1099.[4]

---

4.    *See also Sandoval v. Bd. of Regents*, 67 P.3d 902, 907 (Nev. 2003) ("[R]equiring the regents to comply with Nevada's Open Meeting Law does not infringe on their First Amendment rights. The regents are free to speak on any topic of their choosing, provided they place the topic on the agenda . . . . [W]e do not regard this requirement as too burdensome."); *St. Cloud*, 332 N.W.2d at 7 ("The Open Meeting Law does not violate the rights of free speech or free assembly under the First Amendment of the United States Constitution. These rights protect expression of ideas, not the right to conduct public business in closed meetings. . . . It does not prohibit meetings of affected public bodies; it merely requires that such meetings be open to the public."); *Dorrier v. Dark*, 537 S.W.2d 888, 892 (Tenn. 1976) ("We are not impressed by the argument that a citizen-member of a governing body suffers an infringement of his right to free speech by the requirement that any deliberation toward an official decision must be conducted openly."). *Knight v. Iowa Dist. Court*

TOMA itself has been upheld against First Amendment challenge. *See Hays*, 41 S.W.3d at 181-82 ("[W]e see no restriction of the right of free speech by the necessity of a public official's compliance with the Open Meetings Act when the official seeks to exercise that right at a meeting of the public body of which he is a member. . . . The Open Meetings Act may not, and does not, restrict or abridge protected speech. The problem with Molenaar's remarks is not that he could not make them at all, but rather the location and timing of his comments. . . . [R]equiring compliance with the Open Meetings Act does not violate the First Amendment.").

This judicial consensus in support of open meeting laws is entirely consistent with numerous U.S. Supreme Court decisions upholding other laws likewise designed to further open government against First Amendment challenge. This includes laws that (like TOMA) permit all forms of political speech, but only provided that certain conditions be met—namely, the disclosure and publication of all expenses associated with lobbying speech, corporate campaign speech, and campaign contributions to and expenditures by candidates and elected officials.[5]

---

*of Story County*, 269 N.W.2d 430 (Iowa 1978), is inapposite. *Knight* involved a challenge under the Due Process Clause, not the First Amendment. And the law was struck down solely because (unlike Texas law) it criminalized the mere fact that a closed meeting had occurred—without specifying, in any terms whatsoever, what an individual could do to fall within the prohibition (*e.g.*, "participate in a closed meeting"). TOMA, of course, easily satisfies *Knight*.

5.      *See United States v. Harriss*, 347 U.S. 612, 625 (1954) ("Congress has not sought to prohibit these pressures [from lobbying speech]. It has merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds

Plaintiffs are mistaken when they claim that TOMA is the "most onerous" open meeting law in the nation. As demonstrated, TOMA possesses attributes typical of open meeting laws across the country. But there is something doubly odd about Plaintiffs' attempt to impugn TOMA. Plaintiffs concede that commitment to open government is a cause for pride—not shame. But if that is so, then Texas hardly deserves criticism for serving the cause so diligently.

**C.    The Broad Legislative And Judicial Consensus Favoring Open Meeting Laws Is Understandable—Because Requiring Government Officials To Conduct Public Business In Public Furthers, Rather Than Frustrates, Fundamental First Amendment Values.**

The fact that every state in the nation has enacted open meeting laws—and that every court to address First Amendment challenges to such laws have rejected them—should surprise no one. After all, open government is a founding principle of

---

for that purpose. It wants only to know who is being hired, who is putting up the money, and how much."); *Buckley v. Valeo*, 424 U.S. 1, 68 (1976) ("disclosure requirements . . . directly serve substantial governmental interests"); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 792 n.32 (1978) ("Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected."). These rulings were reaffirmed in *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 353-56 (1995), on the ground that none of those cases involved the speech of purely private individuals and thus could be forcibly disclosed for the public's benefit. In *McIntyre*, the Court invalidated a requirement that private individuals identify themselves before engaging in political speech. The Court did so out of concern that private speech would be "suppress[ed]" as a result, due to fears of social "retaliation." *Id.* at 357. *See also id.* at 382 (Scalia, J., dissenting) (noting government interest in suppressing "mudslinging" and other uncivil speech). This case is of course a far cry from *McIntyre*: After all, the First Amendment—not to mention the republican form of government guaranteed by the Constitution—is squarely premised on the notion that voters have the right to "retaliate" against elected officials by throwing them out of office for exercising their public duties in a manner inconsistent with the wishes of the voters.

our nation. As James Madison once wrote, "[a] popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance. And a people who mean to be their own governors, must arm themselves with the power knowledge gives." Letter from James Madison to W. T. Barry, August 4, 1822, *in* 9 Writings of James Madison 103 (G. Hunt ed. 1910)).

Open meeting laws further, rather than frustrate, governmental interests valued by the First Amendment itself. In most First Amendment challenges, the government attempts to justify its interference with a First Amendment interest in pursuit of some external public objective. In this case, however, it is the First Amendment *itself* that the challenged statute serves. The public interest served by open government laws is not just tolerated by the First Amendment—it is the very embodiment of it.

As the U.S. Supreme Court has repeatedly reminded us, the core purpose of the First Amendment is to empower every citizen to engage in a free, open, and informed discussion about our government, our elected officials, and the policies they put forth. *See, e.g., New York Times v. Sullivan*, 376 U.S. 254, 270 (1964) (noting that the First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"); *Bellotti*, 435 U.S. at 783 (1978) (noting "the role of the First Amendment . . . in affording the public

34

access to discussion, debate, and the dissemination of information and ideas"); *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 541 (1980) (same). *See also Jenevein v. Willing*, 493 F.3d 551, 557 (5th Cir. 2007) (noting that "the public is obliged to inform itself" about its "elected official[s]"); *Tennessee Newspapers, Inc. v. Fed. Hous. Admin.*, 464 F.2d 657, 660 (6th Cir. 1972) ("One of the reasons for the First Amendment, as well as the Freedom of Information Act, is to promote honesty of government by seeing to it that public business functions under the hard light of full public scrutiny.").

Open meeting laws plainly further these fundamental First Amendment values. Indeed, courts have repeatedly invoked the First Amendment itself as a sword to require public access to and openness in a variety of government proceedings. For example, the U.S. Supreme Court has invoked this First Amendment right of public access in a variety of criminal judicial proceedings. *See, e.g.*, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982); *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984). After all, "a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs. By offering such protection, the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper*, 457 U.S. at 604

(quotations and citations omitted). "Thus to the extent that the First Amendment embraces a right of access to criminal trials, it is to ensure that this constitutionally protected 'discussion of governmental affairs' is an informed one." *Id.*

Consistent with these principles, courts have repeatedly interpreted the First Amendment to guarantee public access to a variety of other government proceedings. *See, e.g., Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177, 180-81 (3rd Cir. 1999) ("We have no hesitation in holding Whiteland Woods had a constitutional right of access to the Planning Commission meeting on October 9, 1996. . . . Planning Commission meetings are precisely the type of public proceedings to which the First Amendment guarantees a public right of access"); *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 695 (6th Cir. 2002) ("there is a limited First Amendment right of access to certain aspects of the executive and legislative branches"); *id.* at 700 ("there is a First Amendment right of access to deportation proceedings"); *Cable News Network v. Am. Broad. Cos.*, 518 F. Supp. 1238, 1245 (N.D. Ga. 1981) ("under the First Amendment, [television media] have a limited right of access to White House pool coverage in their capacity as representatives of the public and on their own behalf as members of the press"); *Soc'y. of Prof'l Journalists v. Sec'y of Labor*, 616 F. Supp. 569, 574 (D. Utah 1985), *vacated as moot*, 832 F.2d 1180 (10th Cir. 1987) ("This court is convinced that a right of access is necessary to

the type of hearing [the Mine Safety and Health Administration] conducted in this case."). *But see, e.g., Calder v. IRS*, 890 F.2d 781 (5th Cir. 1989) (construing *Richmond Newspapers* doctrine narrowly in rejecting claim of First Amendment right to see Al Capone's tax records).

These rulings help dramatize a simple but important fact: The First Amendment cannot possibly forbid what, in many contexts, it may actually *require*—namely, openness in government. *Cf. Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 709 (9th Cir. 1997) (stating that the Constitution, "lest we lose sight of the forest for the trees, does not require what it barely permits"). In case after case, courts have enforced a right of public access to a wide variety of government proceedings under the First Amendment itself. And even if this "'right' is more accurately characterized as an 'interest' that States can choose to protect," *Hill v. Colorado*, 530 U.S. 703, 717 n.24 (2000), the point remains the same: Open meeting laws like TOMA further, rather than offend, the First Amendment.

Open meeting laws also do not burden substantial First Amendment interests. Notably, *not one* of the numerous public access decisions mentioned above contemplate that, in the course of enforcing a First Amendment right of access, courts may risk trampling on the competing First Amendment rights of government officials.

No court has done so, because of one simple truth: Elected officials work for the people. They do not have a First Amendment right against the very people they serve. They suffer no actionable First Amendment injury from being required to conduct public business in public, rather than in secret, to the exclusion of the voters who elected them to office in the first place.

To the contrary, elected officials take office knowing full well that they have consented to work under certain conditions—most notably, that they owe a duty of complete loyalty to the people they represent and to serve faithfully on their behalf. And perhaps the most fundamental condition of public service is the duty to engage in public deliberation and decisionmaking so that the public can observe the conduct of their representatives and make informed decisions about their qualifications to remain in public office. As the U.S. Supreme Court has recognized, elected officials "have an obligation to take positions on controversial political questions" so that "their constituents can be fully informed by them, and be better able to assess their qualifications for office" and to assure them that they are indeed "represented in governmental debates by the person they have elected to represent them." *Bond v. Floyd*, 385 U.S. 116, 136-37 (1966).[6]

---

6.    This Court's decision in *Jenevein* is inapposite to this analysis: The speech at issue in that case—delivered at a press conference—was not a required component of the plaintiff's official duties as a state district judge. 493 F.3d at 553. *See also id.* at 561 (speech at issue should have been "take[n] . . . outside").

38

\* \* \*

In short, open meeting laws expand, not suppress, communication. Such laws do not limit public discourse—they broaden it. Their purpose is more speech, not less. The objective is not to close down the marketplace of ideas—but rather, to open it to everyone. Open meeting laws thus expand the rights of listeners—without unduly restricting the rights of speakers. The result of this analysis is equally simple: Open government is precisely what the First Amendment envisions, not condemns.

### D.    Open Meeting Laws Satisfy Traditional First Amendment Analysis.

Although a national legislative and judicial consensus supports open meeting laws, because they further rather than frustrate fundamental First Amendment values, the U.S. Supreme Court to date has not articulated precisely which legal test applies to such laws. Accordingly, although the case for upholding open meeting laws under the First Amendment is strong, it remains an open question for this Court which particular First Amendment test governs the analysis.

The State contends that open meeting laws are best characterized as valid, content-neutral time, place, and manner regulations. But ultimately, open meeting laws are constitutional under any standard, including strict scrutiny.

1.    **Open Meetings Laws Are Content-Neutral, Time, Place, And Manner Regulations Under *Ward v. Rock Against Racism*.**

Courts across the country have analyzed open meetings laws as time, place, or manner regulations under the First Amendment (and upheld them accordingly). *See, e.g., Cole*, 673 P.2d at 350; *Difanis*, 414 N.E.2d at 739. *Cf. Finger v. Garza*, 98 F. App'x 326 (5th Cir. 2004) (noting concession by plaintiffs that San Antonio open meeting ordinance "is a reasonable time, place, and manner restriction"). After all, open meeting laws simply impose modest regulations on how certain speech may be presented. No speech is actually forbidden by such laws.

To determine the validity of a time, place, or manner regulation, courts apply the three-part test articulated in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). According to *Ward*, "[o]ur cases make clear . . . the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided [1] the restrictions are justified without reference to the content of the regulated speech, [2] that they are narrowly tailored to serve a significant governmental interest, and [3] that they leave open ample alternative channels for communication of the information." 491 U.S. at 791. *See also Hill*, 530 U.S. at 719-20, 725-26 (same); *Palmer v. Waxahachie ISD*, 2009 WL 2461889, *10 (5th Cir. Aug. 13, 2009) (same); *Knowles v. City of Waco*, 462 F.3d 430, 433-34 (5th Cir. 2006) (same).

Content neutrality. Plaintiffs do not dispute that TOMA should be judged as a time, place, or manner regulation of speech. They simply contend that TOMA is a content-based—not content-neutral—time, place, or manner regulation of speech.

But Plaintiffs apply the wrong test for determining content neutrality. Indeed, they do not even mention the governing test under *Ward*—let alone even attempt to contend that TOMA in any way fails that test. That is an odd and fatal omission, considering that *Ward* is the "preeminent case on content-neutral regulation," as this Court recently reaffirmed. *Palmer*, 2009 WL 2461889 at *10.

Plaintiffs focus exclusively on the fact that, on its face, TOMA (like all open meeting laws) does not apply to all speech, but only to a certain category of speech—namely, speech about the people's business. But the question under *Ward* is not whether a regulation *applies* only to certain speech based on content—but rather, whether the regulation serves a *government interest* that is based on content.

In a fatal omission, Plaintiffs never contend that the government interest served by TOMA is based on content. To the contrary, Plaintiffs expressly concede that TOMA serves a compelling governmental interest in open government—an interest that is indisputably content neutral. This omission is devastating to Plaintiffs' attempt to subject TOMA to strict scrutiny. *See, e.g., Miller*, 421 F.3d at 349 (5th Cir. 2005) (arguments not made prior to en banc rehearing are waived).

Under *Ward*, "[t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech *because of disagreement with the message it conveys*." 491 U.S. at 791 (emphasis added). *"The government's purpose is the controlling consideration.* A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* (emphasis added). "Government regulation of expressive activity is content neutral so long as it is *justified* without reference to the content of the regulated speech." *Id.* (quotations omitted). The Supreme Court has repeatedly reaffirmed this understanding of content neutrality. *See, e.g., Hill*, 530 U.S. at 719-20 (same); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 122 n.* (1991) ("statutes [are] content neutral where they were intended to serve purposes unrelated to the content of the regulated speech, despite their incidental effects on some speakers but not others").

So the issue is not whether a regulation facially applies only to particular content—but rather, whether the government interest served by the regulation is to *reduce* or *suppress* a particular category of speech. After all, "[a]t the heart of the First Amendment" is the concern that "the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or

42

manipulate the public debate through coercion rather than persuasion." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 641 (1994). It is only when a facially content-based regulation "is motivated by nothing more than a desire to *curtail expression*" that a statute will be deemed content-based and presumptively unconstitutional. *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 546 (1980) (Stevens, J., concurring) (emphasis added). *See id.* at 537, 540 n.9 (invalidating content ban because regulation "does not further a governmental interest unrelated to the suppression of speech" and has "undertaken to suppress certain bill inserts precisely because they address controversial issues of public policy").

Accordingly, the vast majority of the judges of this Court have held that content neutrality is determined based on government interest, and not on the operation and application of the statute itself.[7] Likewise, this Court has treated a

---

7.    *See, e.g., Palmer*, 2009 WL 2461889 at \*9-10 (quoting *Ward*); *Pruett v. Harris County Bail Bond Bd.*, 499 F.3d 403, 409 n.5 (5th Cir. 2007) (rejecting claim that "strict scrutiny should apply because the restrictions here are content-based," noting that the challenged law "does not have as a goal the suppression of speech"); *World Wide Street Preachers Fellowship v. Town of Columbia*, 245 F. App'x 336, 344 (5th Cir. 2007) (quoting *Ward*); *Illusions-Dallas Private Club, Inc. v. Steen*, 482 F.3d 299, 308 (5th Cir. 2007) ("The statute's predominant purpose determines the level of scrutiny. If [a law] is intended to suppress expressions . . . then it is subject to strict scrutiny. If [a law] has a purpose unrelated to the suppression of speech, then it is subject to intermediate scrutiny.") (citations omitted); *Fantasy Ranch Inc. v. City of Arlington*, 459 F.3d 546, 554-56 (5th Cir. 2006) ("We must first determine, then, what level of scrutiny applies, a question that depends on whether the government's predominate purpose in enacting the regulation is related to the suppression of expression itself."); *Brazos Valley Coal. for Life, Inc. v. City of Bryan*, 421 F.3d 314, 326-27 (5th Cir. 2005) ("a regulation is generally 'content neutral' if its restrictions on speech are not based on disagreement with the message it conveys," "notwithstanding that their effect may in certain instances effectively limit speech"); *de la O v. Hous. Auth. of City of El Paso*, 417 F.3d 495, 503 (5th Cir. 2005) ("the state may enforce time, place, and manner restrictions . . . as long as the

43

variety of laws and regulations as content neutral, based on the government interest they serve, and notwithstanding the fact that the law in question applied only to certain speech based on content.[8]

There is an important practical reason why courts analyze content neutrality in this manner, analyzing government interest and treating regulations as content neutral even if they regulate based on content. After all, "[i]t is common in the law to examine the content of a communication to determine the speaker's purpose"—in this case, a purpose to conduct public business. *Hill*, 530 U.S. at 721. For example, in

---

regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view"); *N.W. Enters. Inc. v. City of Houston*, 352 F.3d 162, 174 (5th Cir. 2003) ("This court has invariably analyzed ordinances regulating SOBs as content-neutral time, place, and manner restrictions where the legislative record demonstrated that the municipality's predominant concern was to regulate secondary effects of SOBs and not to censor the expression itself."); *Encore Videos, Inc. v. City of San Antonio*, 330 F.3d 288, 292 (5th Cir. 2003) (quoting *Ward*); *LLEH, Inc. v. Wichita County*, 289 F.3d 358, 365 (5th Cir. 2002) ("zoning ordinances designed to combat the undesirable secondary effects of [SOBs] are to be reviewed under the standards applicable to 'content-neutral' time, place, and manner regulations"); *Horton v. City of Houston*, 179 F.3d 188, 193 (5th Cir. 1999) ("a rule that is applied because of disagreement with a message presented or a rule that has a substantial risk of eliminating certain ideas or viewpoints from the public dialogue are content-based . . . [i]f, on the other hand, the regulation is justified without reference to the content of the speech or serves purposes unrelated to the content, it is a content-neutral regulation, even if it has an incidental effect on some speakers or messages but not others").

8.    *See, e.g., Palmer*, 2009 WL 2461889 at *9 (upholding school dress code forbidding most categories of speech while allowing other limited categories of speech, noting that "[s]imilar allegedly-content-based dress code exceptions have been examined by three other federal courts and found to be content-neutral"); *Pruett*, 499 F.3d at 409 n.5 (treating content-based regulation of commercial solicitation speech as content-neutral regulation); *Illusions*, 482 F.3d at 308 (treating regulation of adult entertainment as content neutral, despite the fact that regulation does not apply to other forms of entertainment). *Jenevein v. Willing*, 493 F.3d 551 (5th Cir. 2007), is distinguishable—there, the government was plainly suppressing a particular category of speech, and it was doing so specifically based on concerns about that speech.

order to enforce a general prohibition on picketing, the government naturally must look at content in order to determine whether the expression in question constitutes picketing or merely "social, random, or other everyday communications." *Id.* Yet the Supreme Court has "never suggested that the kind of cursory examination that might be required to exclude casual conversation from the coverage of a regulation of picketing would be problematic." *Id.* at 722.

So too here. The administration of any rational open meetings regime necessarily requires government to look at content. But any such review will entail, as in *Hill*, only a "cursory examination," for the limited purpose of excluding "pure social or random conversation" and other exchanges that do not concern public business. *Id.* at 721-22.

Plaintiffs' contention that open meeting laws are content based is thus fatally flawed for one simple reason: They ask the wrong question. Under established precedent, the question is not *what* does the law do—but rather, *why* is the law doing it. The Supreme Court has "never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct." *Hill*, 530 U.S. at 721. Contrary to Plaintiffs' submission, "it is incorrect to state that a time, place, or manner restriction may not be based upon either the content or subject matter of speech." *Consol. Edison*, 447

45

U.S. at 545 (Stevens, J., concurring).   Indeed, this Court just recently rejected a

plaintiff's attempt to ignore government interest in assessing content neutrality. *See*

*Palmer*, 2009 WL 2461889 at *9-10.

Plaintiffs appear to rely primarily on *Burson v. Freeman*, 504 U.S. 191 (1992),

to support their conclusion that all open meeting laws are content based and therefore

subject to strict scrutiny.   But their reliance on *Burson* is troubling on several levels.

To begin with, *Burson* not only *rejected* a First Amendment attack on a state

law—it did so by a splintered 4-1-3 vote that produced no majority opinion or

rationale for its holding.   Yet Plaintiffs never disclosed that they are relying on a

*plurality* opinion to support their mistaken conclusion that strict scrutiny applies to

open meeting laws.

Moreover, the *Burson* plurality justified its application of strict scrutiny based

on conditions that plainly do not exist here.   The plurality relied heavily on the

"important" fact that the plaintiff was attacking a ban on political speech that occurs

in a "quintessential public forum[]"—namely, a ban on all political speech within 100

feet of a polling place on election day.   *Id.* at 196.   The fact that *Burson* involved a

"public forum" proved critical to the plurality's analysis.   As the plurality explained,

"the First Amendment's hostility to content-based regulation extends not only to a

restriction on a particular viewpoint, but also to a *prohibition* of *public* discussion of an entire topic." *Id.* at 197 (emphasis added).

Unlike the law upheld in *Burson*, open meeting laws do not prohibit all public discussion of a particular topic—to the contrary, open meeting laws do precisely the *opposite*: they require that certain speech be conducted in public.[9]

What's more, Justice Kennedy—one of the four justices who comprised the *Burson* plurality—wrote separately to express his view that the ban on political speech he voted to uphold was in fact content neutral, not content based. That was so, he explained, because the issue under *Ward* is government interest: "As the Court has recognized in the context of regulations of the time, place, or manner of speech, '[g]overnment regulation of expressive activity is content neutral so long as it is *justified* without reference to the content of the regulated speech.'" *Id.* at 212 (Kennedy, J., concurring) (quoting *Ward*). A regulation is content neutral so long as the government is pursuing an interest "unrelated to the *suppression* of speech or ideas." *Id.* at 213 (emphasis added). "[I]n time, place, and manner cases, the regulation's justification is a central inquiry." *Id.* Justice Scalia, who provided the

---

9. This Court's decision in *Schirmer v. Edwards*, 2 F.3d 117 (5th Cir. 1993), is likewise distinguishable, because it upholds the same kind of statute as that upheld in *Burson*, and closely mirrors the *Burson* plurality in its analysis. *See id.* at 119-20.

critical fifth vote to uphold the law, likewise rejected the invocation of strict scrutiny, albeit on different grounds. *See id.* at 214-16.

* * *

Because Plaintiffs rely exclusively on their facial analysis of TOMA, their entire content neutrality argument is fatally flawed. Tellingly, Plaintiffs do not even bother to contest that the interest in open government served by TOMA is content neutral. To the contrary, as noted, Plaintiffs expressly recognize that open government is a compelling state interest. *See, e.g., Miller*, 421 F.3d at 349 (5th Cir. 2005) (arguments not made prior to en banc rehearing are waived).

Notably, Plaintiffs do not even attempt to contend that TOMA is content based just because some members of governmental bodies covered by the Act may decide to refrain from engaging in certain kinds of speech—namely, speech that officials would rather the general public not hear. After all, it does not matter that a law may have an *incidental* adverse impact on speech.

A regulation is not content based just because it may have a negative impact on speech—so long as any such impact is incidental, rather than purposeful. As the Supreme Court has explained, "[t]he government's *purpose* is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an *incidental* effect on some speakers or

48

messages but not others." *Ward*, 491 U.S. at 791 (emphasis added). *See also Simon & Schuster*, 502 U.S. at 122 n.* ("statutes [are] content neutral where they were *intended* to serve purposes unrelated to the content of the regulated speech, despite their *incidental* effects on some speakers but not others") (emphasis added).

Plaintiffs do not deny that any indirect negative impact on speech due to an open meeting law is indeed incidental, not purposeful. If anything, the Legislature was plainly trying to *expand*—not reduce—communication, by ensuring that *more* listeners can hear the speech at issue, and to empower voters to make educated decisions by providing them with more information.

If there is certain speech that elected officials for some reason would not want their constituents to hear, the purpose of open meeting laws would be well served if voters could hear that speech anyway—indeed, the government's interest would be at its apogee. Any negative impact on speech is therefore not just incidental—it is *antithetical* to the government interest served by open meeting laws.

What's more, any negative effect on speech would not only be incidental—it would be entirely self-inflicted. Open government laws do not prevent one word from being spoken; they simply require greater disclosure of those words. In *Harriss*, the Supreme Court observed that such laws (in that case, a federal lobbying registration and disclosure law) could have the effect of discouraging some people

49

from speaking. But "even assuming some such deterrent effect, the restraint is at most an indirect one resulting from *self-censorship*"—not censorship caused by the statute itself. 347 U.S. at 626 (emphasis added).

In sum, any indirect impact on speech caused by TOMA is incidental, unintentional, self-inflicted, antithetical to the content-neutral compelling governmental interest served by the Act, and unprotected by the First Amendment.

Narrow tailoring. Under *Ward*, "the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." 491 U.S. at 799. In applying this standard, courts must "defer" to reasonable determinations that a particular policy will serve the interest well. *Id.* at 800. *See also id.* at 803 (Marshall, J., dissenting) (criticizing majority for requiring "deference"); *Hill*, 530 U.S. at 727 ("whether or not the 8-foot interval is the best possible accommodation of the competing interests at stake, we must accord a measure of deference to the judgment of the [] Legislature"). Moreover, the regulation need not be the least restrictive means of achieving the governmental objective. *See Ward*, 491 U.S. at 797-99; *Hill*, 530 U.S. at 726 & n.32; *Knowles*, 462 F.3d at 434. TOMA easily satisfies narrow tailoring under the deferential *Ward* standard, and Plaintiffs do not contend otherwise.

Ample alternative channels for communication. Finally, the burden on elected officials imposed by open meeting laws is minimal, bordering on nonexistent. After all, open meeting laws do not forbid officials from speaking about anything. They simply require officials to do so in public, in view of the voters they serve.

*Ward* is, again, instructive. There, the Court upheld a noise ordinance despite the fact that "the city's limitations on volume may reduce to some degree the potential audience for respondent's speech . . . for there has been no showing that the remaining avenues of communication are inadequate." *Id.* at 802. This case is even easier—open meeting laws *increase* the potential audience for the speech in question.

### 2.    Open Meetings Laws Also Satisfy Strict Scrutiny Under The Plurality Opinion In *Burson v. Freeman* In Any Event.

It should surprise no one that open meeting laws are subject to only modest judicial review under the *Ward* framework, rather than presumptive invalidity under the strict scrutiny standard. After all, strict scrutiny is an extraordinary standard of judicial review, generally reserved for those laws that warrant the highest degree of judicial suspicion. Open government laws further First Amendment values—they do not warrant judicial suspicion.

But in all events, open meeting laws, including TOMA, satisfy strict scrutiny as well. Plaintiffs readily concede that open government is a compelling governmental interest. *See, e.g., Miller*, 421 F.3d at 349 (5th Cir. 2005) (arguments

not made prior to en banc rehearing are waived); *see also Harriss*, 347 U.S. at 626 (recognizing "vital national interest" served by lobbying disclosure laws). Plaintiffs simply contend that TOMA is not narrowly tailored to further open government. They present one basic contention: Criminal imprisonment is not necessary, given that other states are content to limit themselves to civil fines and penalties.

But narrow tailoring does not require uniformity of remedy. It does not impose a cookie cutter, one-size-fits-all framework on, or eliminate all discretion by, policymakers. Just because one jurisdiction may take a more modest approach to furthering a particular compelling governmental interest does not mean that another jurisdiction cannot take a different approach.

Consider the plurality opinion in *Burson*—Plaintiffs' primary authority for subjecting TOMA to strict scrutiny. The *Burson* plurality concluded that imposing a 100-foot ban on political speech near polling places was still narrowly tailored to protect electoral integrity, 504 U.S. at 208-10, despite the fact that other jurisdictions were fully satisfied imposing smaller zones of "50 feet or less," *id.* at 218 (Stevens, J., dissenting). As the plurality reasoned, this was at most "a difference only in degree, not a less restrictive alternative in kind." *Id.* at 210.

So too here, with respect to the possibility of modest jail time in addition to a modest fine. Indeed, the statute upheld in *Burson* itself authorized "a term of

imprisonment not greater than 30 days," *id.* at 194—yet even the dissent did not bother to mention that fact in its narrow tailoring analysis. *See also Harriss*, 347 U.S. at 627 (upholding federal lobbying disclosure law notwithstanding possibility of imprisonment); *Buckley*, 424 U.S. at 64 (upholding federal campaign finance disclosure law notwithstanding possibility of up to one year imprisonment).

### E.    The Text Of TOMA Is Typical Of Open Meeting Laws Across The Nation And Is Neither Overbroad Nor Vague.

Ordinarily, an overbreadth or vagueness challenge is premised on the fact that a statute has been poorly written—such that, in the course of targeting unprotected speech, the text inadvertently sweeps in too much protected speech (overbreadth) or does not clearly refrain from doing so (vagueness). *See Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) (overbreadth); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (vagueness).

Plaintiffs who invoke these doctrines are asking the Court to invalidate a statute in all its applications, and thus bear a particularly heavy burden of proof. *See, e.g., New York v. Ferber*, 458 U.S. 747, 769 (1982) ("Because of the wide-reaching effects of striking down a statute on its face . . . we have recognized that the overbreadth doctrine is strong medicine and have employed it with hesitation, and then only as a last resort.") (quotations omitted); *Hill*, 530 U.S. at 733 ("Speculation about possible vagueness in hypothetical situations not before the Court will not

53

support a facial attack on a statute when it is surely valid in the vast majority of its intended applications.") (quotations omitted).

In this case, however, Plaintiffs' overbreadth and vagueness challenges appear to be nothing more than a repackaging of their earlier mistaken reading of TOMA, and thus do not come close to satisfying the heavy burden required to invalidate a statute on its face under either doctrine. Because TOMA expressly applies only to knowing active participation by public officials in closed meetings—and not to passive, inadvertent acts such as receipt of e-mail—it is a statute with a readily understandable and constitutionally unproblematic center. It prohibits exactly what it was intended to prohibit: "governing bodies conducting public business behind closed doors." Pltfs' En Banc Br. at 7. Accordingly, Plaintiffs' overbreadth and vagueness challenges necessarily fail.

Elected officials owe a duty to the people they serve, just as lawyers owe a duty to the clients who retain them—so an analogy to legal ethics may be appropriate. Members of the legal profession understand that purely social conversations between lawyers and judges are entirely permissible, while *ex parte* discussions about pending cases are not. *See, e.g.*, TEX. DISCIPLINARY R. OF PROF'L CONDUCT 3.05(b) (1989). Such rules against *ex parte* communications impose no intolerable uncertainty or ambiguity on the legal profession. Judges and lawyers need not avoid social events

or feel paralyzed by fear of inadvertently violating *ex parte* rules. Likewise, no constitutional violation results from imposing similar duties on elected officials.

**F.     Plaintiffs' Analogy To Campaign Finance Restrictions Is Not Only Inapposite—It Is Self-Defeating.**

Finally, Plaintiffs' attempt to analogize First Amendment cases invalidating certain campaign finance restrictions is not only meritless—it defeats their own case. Pltfs' En Banc Br. at 30-32. After all, TOMA does not forbid speech or the expenditure of funds to engage in speech. TOMA merely requires the *disclosure* of speech to the general public—much as established First Amendment law allows the mandatory disclosure of campaign contributions and expenditures to the same audience. *See, e.g., supra* at 32-33 (discussing *Buckley* and *Harriss*).

Relatedly, Plaintiffs' attempt to limit open meeting laws to only those situations that involve actual "*quid pro quo* corruption" is not only unworkable—it would gut the entire project of open government to nullify every open meeting law except as applied to corrupt elected officials. Pltfs' En Banc Br. at 30-32. No court has ever embraced that proposition. Indeed, Plaintiffs themselves do not seem serious about it, considering their previous (and subsequent) statements that "there certainly is a compelling government interest in open government," that "[i]t is undisputed that open government demands that decisions be made in the open, and that the public has full opportunity to know what is decided and the reasons behind it," and that

55

Plaintiffs "in no way endorse governing bodies conducting public business behind doors." *Id.* at 7, 8, 36.

\* \* \*

The State does agree with Plaintiffs on at least this much: There is no need to remand this case back to the district court for further proceedings.

The Court should dismiss the appeal as moot—or, in the alternative, affirm the judgment below on the merits. TOMA no longer applies to Plaintiffs, and it plainly allows the conduct Plaintiffs claim it forbids.

Plaintiffs emphatically affirm that states may validly pursue the principle of open government and require all public business to be conducted in the open. That is all that TOMA does.

## CONCLUSION

The Court should dismiss the appeal as moot—or alternatively, affirm the judgment below on the merits.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

C. ANDREW WEBER
First Assistant Attorney General

DAVID S. MORALES
Deputy Attorney General
for Civil Litigation


JAMES C. HO
Solicitor General
Texas Bar No. 24052766

SEAN D. JORDAN
Deputy Solicitor General

THOMAS M. LIPOVSKI
Assistant Solicitor General

PETER HANSEN
REED N. SMITH
Assistant Attorneys General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
[Tel] (512) 936-1700
[Fax] (512) 474-2697

COUNSEL FOR APPELLEE GREG ABBOTT

57

J. STEVEN HOUSTON
P.O. Box 388
Marathon, Texas 79842
State Bar No. 10054300
[Tel.] (432) 386-6054
[Fax] (432) 386-4203

COUNSEL FOR APPELLEE FRANK D. BROWN

58

## CERTIFICATE OF SERVICE

The undersigned counsel of record does hereby certify that two true and correct copies of the Supplemental Appellee's Brief, along with a computer readable disk copy of the brief, was served via FedEx (Next Day Air Delivery), on August 28, 2009, to:

Dick DeGuerin
DEGUERIN, DICKSON & HENNESSEY
1018 Preston Ave., 7th Floor
Houston, Texas 77002

J. Steven Houston
P.O. Box 388
Marathon, Texas 79842

Arvel Rodolphus Ponton, III
2301 N. Highway 118
P.O. Box 9760
Alpine, Texas 79831

COUNSEL FOR APPELLANTS

COUNSEL FOR APPELLEE
FRANK BROWN

Counsel also certifies that on August 28, 2009, Supplemental Appellee's Brief, 21 paper copies thereof, and one computer-readable disk copy in Adobe Portable Document Format, was dispatched to the clerk, as addressed below, via FedEx (Next Day Air Delivery):

Mr. Charles R. Fulbruge III, Clerk
U.S. COURT OF APPEALS FOR THE FIFTH CIRCUIT
600 Maestri Place
New Orleans, Louisiana 70130

Sean D. Jordan

**CERTIFICATE OF COMPLIANCE**
With Type-Volume Limitation, Typeface Requirements,
and Type Style Requirements

1.  This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

    [ ]  this brief contains **13,951** words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii), *or*

    [ ]  this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

    [X]  this brief has been prepared in a proportionally spaced typeface using *WordPerfect for Windows, version 11* in *Times New Roman 14-point type face*, or

    [ ]  this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Sean D. Jordan

Dated: August 28, 2009

60